**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

ORIGINAL

CRYE PRECISION LLC, and LINEWEIGHT LLC,

Docket No.

         **Plaintiffs,**

CV 15 - 0221

   v.

COMPLAINT

BLOCK, J.

BENNETTSVILLE PRINTING

      **Defendant.**

REYES, M.J

Plaintiffs Crye Precision LLC ("Crye Precision") and Lineweight LLC ("Lineweight") (together with Crye Precision "Crye") by their attorneys, Greenberg Traurig, LLP, as and for their Complaint against Bennettsville Printing ("Bennettsville"), allege as follows:

**Nature of the Action**

1.     In this action, Crye seeks a declaratory judgment that Bennettsville is bound by the terms and conditions of a certain Intellectual Property License Agreement entered into as of May 30, 2014 ("2014 License Agreement") pursuant to which Crye granted Bennettsville a non-exclusive license to reproduce or transfer on certain products Crye's MultiCam® brand camouflage pattern and technology ("MULTICAM"). Crye also seeks preliminary and permanent injunctive relief concerning Bennettsville's breach of the 2014 License Agreement and Bennettsville's continuing obligations under a prior now-expired license agreement and Bennettsville's misappropriation of Crye's proprietary rights.

2.     MULTICAM was developed by Crye Precision and its affiliate, Lineweight, and is intended for application onto fabric and other substrates.

3.     MULTICAM is the subject of a United States design patent, and the MultiCam®

trademark is registered with the United States Patent and Trademark Office ("USPTO"). The design patent is owned by Lineweight. Crye Precision is the sister company of Lineweight and has the exclusive right to sublicense the MultiCam® design patent and other intellectual property associated with MULTICAM.

4.     MULTICAM has been the camouflage of choice for United States Special Forces for nearly a decade, and since 2010 every United States soldier deployed to Afghanistan wears MULTICAM garments.  MULTICAM currently is also being applied onto hundreds of different substrates marketed commercially to the general population.

5.     From 2010 to date, Bennettsville has been licensed by Crye to print and sell products incorporating MULTICAM ("MULTICAM Products") in fulfillment of contracts issued by the United States Department of Defense ("Government Sales"). Since May 30, 2014, Bennettsville has also been licensed by Crye to print and sell MULTICAM Products for commercial sale.

6.     In accordance with its 2014 License Agreement, except for the products for which Crye is entitled to receive a Licensing Fee, Bennettsville expressly agreed at any time during the term of the agreement or at any time thereafter, not to "make or provide, or assist or encourage others to make, products which are confusingly similar in design or appearance (i.e., color palette, arrangement or placement of elements) to" *inter alia*, MULTICAM.

7.     Notwithstanding Bennettsville's agreement not to make confusingly similar products without Crye's authorization, Bennettsville has begun to print for the United States Department of Defense, a camouflage pattern referred to as Scorpion W2, which is virtually indistinguishable from MULTICAM.

8.     Bennettsville's printing and selling of products incorporating Scorpion W2

2

("Scorpion W2 Products") is a breach of the express terms of its 2014 License Agreement, and a misappropriation of Crye's property, which, unless enjoined, will cause Crye irreparable harm for which it has no adequate remedy at law.

## Parties and Jurisdiction

9. Plaintiff Crye Precision LLC is a New York limited liability company with its principal place of business in Brooklyn, New York.

10. Plaintiff Lineweight LLC is a New York limited liability company with its principal place of business in Brooklyn, New York.

11. Upon information and belief, Defendant Bennettsville is a Delaware limited liability company with its principal place of business in New London, Connecticut.

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 inasmuch as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of costs.

13. Venue is proper in this Court because in the license agreement at issue, the parties agreed that "any litigation arising out of or in connection in any way with this agreement shall take place in a State or federal court of competent jurisdiction in the State of New York."

## The Camouflage Pattern and Technology

14. In 2003, through extensive research, testing and analysis, Crye developed a camouflage pattern known as MULTICAM.

15. On May 29, 2009 the USPTO issued to Lineweight Design Patent No. D592,861 (the "'861 Patent"), which embodies the MULTICAM camouflage pattern. A true and correct copy of the '861 Patent is attached hereto as **Exhibit A**.

16. In 2010, Crye's MULTICAM was selected as the standard issue camouflage

pattern for all U.S. Soldiers deployed to Afghanistan, and was renamed "Operational Enduring

Freedom Camouflage Pattern", or "OCP", by the U.S. Government.

17.   In 2010, at the request of the United States Department of Defense, and to help

ensure that the Department of Defense would have access to an uninterrupted supply of

MULTICAM fabric, Crye appointed several United States-based printers, including

Bennettsville, as non-exclusive licensees authorized to print and sell MULTICAM Products in

connection with Government Sales.

18.   In or about 2014, the Department of Defense announced that it intends to switch

from MUTLICAM to Scorpion W2, a camouflage pattern virtually indistinguishable from

MULTICAM.

19.   Crye's licensees, other than Bennettsville, have acknowledged that Crye is

entitled to licensing fees from the licensees' sale of Scorpion W2 Products, just as it is entitled to

licensing fees on the sale of MULTICAM Products.

20.   Bennettsville claims it has the right to print and sell Scorpion W2 Products

without Crye's consent and without paying Crye licensing fees.

### Bennettsville's License Agreements

21.   In 2010 and again in 2012, Crye entered into non-exclusive license agreements

with various printers, including Bennettsville, which permitted the printers to print and sell

MULTICAM Products in the United States in connection with Government Sales.

22.   The Non-Exclusive License Agreement dated April 10, 2012 between Crye and

Bennettsville ("2012 License Agreement"), a copy of which is attached hereto as **Exhibit B**,

contained the following provision, which expressly survived the expiration or termination of the

Agreement:

4

> [Bennettsville] acknowledges and agrees that it will not . . . during or after the term or expiration of this Agreement, make any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM. Furthermore, [Bennettsville] agrees that its shall not make any additions to, new renderings of, or modifications, embellishments, derivative works or other changes of or to MULTICAM or any other intellectual property rights of CRYE without CRYE's prior written consent and Licensee agrees that all such additions, renderings, modifications, embellishments, derivative works or otherwise shall be and remain the sole property of CRYE.

Ex. A, § 3(h).

23.     In 2014, upon expiration of the 2012 license agreements, Crye entered into new non-exclusive license agreements with various printers, including Bennettsville. Pursuant to these new license agreements, Crye authorized the printers to print and sell MULTICAM Products in connection with both Government Sales and commercial sales. A true and correct copy of the Printing License Agreement between Crye and Bennettsville (the "2014 License Agreement") is attached hereto as **Exhibit C**.

24.     By letter dated October 29, 2014 ("October 29 Letter"), Bennettsville advised Crye that it "does not consider itself bound by any agreement with Crye Precision." A true and correct copy of the letter is attached hereto as **Exhibit D**.

25.     Crye responded to the October 29 Letter by letter dated December 16, 2014, a true and correct copy of which is attached hereto as **Exhibit E**. In the letter, Crye explained that Bennettsville is bound by the 2014 License Agreement and, in any event, is bound by its continuing obligations under the 2012 License Agreement.

26.     In 2014, a contractor for the Department of Defense placed with Bennettsville and one other printer (a current Crye licensee) two developmental orders for approximately 2000 yards of fabric each printed in Scorpion W2, which orders Bennettsville and the other printer

fulfilled.

27.     Upon information and belief, one or more contractors for the Department of Defense intend to begin placing production orders for fabric printed in Scorpion W2 this month and Bennettsville intends to fulfill those orders in violation of, among other things, Bennettsville's obligations under the 2014 License Agreement and its continuing obligations under the expired 2012 License Agreement.

**First Claim**
**(Declaratory Relief)**

28.     Crye repeats and realleges each and every allegation contained in paragraphs 1 through 27 of this Complaint as if fully set forth herein.

29.     As demonstrated by the positions taken in Bennettsville's October 29 Letter and Crye's response in the December 16 Letter, there is a genuine controversy as to whether Bennettsville is bound by the 2014 License Agreement.

30.     Crye tendered the 2014 License Agreement to Bennettsville on April 16, 2014. On April 17, 2014, Bennettsville's Ronald Levine, who had just met with Gregg Thompson of Crye, sent an email acknowledging receipt of the Agreement and stating: "I'm signing the license now and sending it to [Gregg] under separate cover."

31.     Crye received the 2014 License Agreement from Bennettsville executed as follows: "By Bennettsville Printing its Vice President." Upon information and belief, the Vice President who executed the Agreement is Ronald H. Levine, who Bennettsville listed in Schedule B to the Agreement as Bennettsville's "point of contact." Although the Vice President did not sign his name to the Agreement, he clearly executed it as the Vice President on behalf of Bennettsville. All of the handwritten information on the 2014 License Agreement and Schedules was filled in by Bennettsville.

6

32.    As referenced in Section 2.1.2 of the 2014 License Agreement, the Agreement included as Schedule E a blank template of a Licensing Fee form, which was to be completed by Crye after Crye received from Bennettsville, and approved, Bennettsville's product samples.

33.    Shortly after delivering one or more first article samples, on June 16, 2014, Bennettsville's Ronald Levine emailed Crye's Gregg Thompson asking whether he "approved our first article sample sent to you."

34.    On August 7, 2014, Bennettsville submitted a "MultiCam Mill request" for screens, which request was approved on August 11, 2014.

35.    In accordance with Section 2.1.1 of the 2014 License Agreement, on October 24, 2014, Crye delivered Bennettsville a completed Licensing Fee form.

36.    Crye seeks a declaratory judgment that the Bennettsville 2014 License Agreement is a valid and binding contract between Crye and Bennettsville and is in full force and effect.

## Second Claim
### (Breach of 2014 License Agreement – Injunctive Relief)

37.    Crye repeats and realleges each and every allegation contained in paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.    The 2014 License Agreement is a valid and binding contract between Crye and Bennettsville that is in full force and effect.

39.    Crye has fully performed all of its obligations pursuant to the 2014 License Agreement.

40.    Section 1.1 of the 2014 License Agreement grants Bennettsville the right to practice Crye's IP in connection with making the products listed in Schedule B of the Agreement ("Products"). The Products listed in Schedule B are all MULTICAM Products.

41.    Section 1.4 of the 2014 License Agreement prohibits Bennettsville from

7

manufacturing or selling variations or modifications of the Products unless and until the Agreement is amended to include the variations or modifications and a licensing fee is assigned to such variations or modifications.

42.     Section 1.8 of the 2014 License Agreement states: "[N]othing herein shall be deemed as granting [Bennettsville] the right to practice the IP in connection with the development, manufacture or sale of any product other than the Products."

43.     Section 7 of the 2014 License Agreement, under the heading **Restriction on Similar Products**, states as follows:

> Except for the products for which Crye shall be entitled to receive Licensing Fees, Licensee agrees that it shall not at any time during the term of this Agreement or at any time thereafter, make or provide, or assist or encourage others to make, products which are confusingly similar in design or appearance (i.e., color palette, arrangement or placement of elements) to, or which constitute derivative works of, any of the IP.

44.     While Crye would be willing to amend the 2014 License Agreement to add Scorpion W2 Products to the list of Products in Schedule B such that Bennettsville would have the right to practice Crye's IP in connection with the printing and sale of Scorpion W2 Products, and assign a licensing fee to Scorpion W2 Products, Bennettsville has not requested such an amendment.

45.     Bennettsville has breached and continues to breach the 2014 License Agreement by printing and selling products expressly prohibited by Sections 1.4, 1.8, and 7 thereof, including, but not limited to, Scorpion W2 Products.

46.     Section 13 of the 2014 License Agreement, under the heading **Remedies,** states as follows:

> Licensee agrees that Crye's remedies at law for breach of the provisions of . . . Section 1 [and] Section 7 . . . of this Agreement are inadequate and that Crye shall be entitled to equitable relief, including without limitation, injunctive relief and/or specific performance, in addition to the remedies provided by contract and/or by law.

8

47.     Unless Bennettsville is enjoined from continuing to breach its obligations under the 2014 License Agreement as alleged herein, Crye will be irreparably harmed.

48.     Crye has no adequate remedy at law with regard to Bennettsville's breach its obligations under the 2014 License Agreement as alleged herein.

49.     By reason of the foregoing, Bennettsville should be preliminarily and permanently enjoined from printing Scorpion W2 Products or a confusingly similar pattern without Crye's express written authorization.

## Third Claim
### (Breach of 2012 License Agreement – Injunctive Relief)

50.     Crye repeats and realleges each and every allegation contained in paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51.     If the Court were to find the 2014 License Agreement not to be a valid and binding agreement, Bennettsville would be subject to its continuing obligations under the 2012 License Agreement.

52.     The 2012 License Agreement was a valid and binding agreement between Crye and Bennettsville that expired on April 10, 2012.

53.     Crye has fully performed all of its obligations pursuant to the 2012 License Agreement.

54.     Under Section 3(h) of the 2012 License Agreement, during the term and following expiration of the Agreement, Bennettsville was expressly prohibited from making products similar to the MULTICAM Products:

> [Bennettsville] acknowledges and agrees that it will not . . . during or after the term or expiration of this Agreement, make any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated

9

> in MULTICAM. Furthermore, [Bennettsville] agrees that its shall not make any additions to, new renderings of, or modifications, embellishments, derivative works or other changes of or to MULTICAM or any other intellectual property rights of CRYE without CRYE's prior written consent and Licensee agrees that all such additions, renderings, modifications, embellishments, derivative works or otherwise shall be and remain the sole property of CRYE.

Ex. B, § 3(h).

55.    In Section 7(c) of the 2012 License Agreement, Bennettsville agreed that it would not at any time during or after the Agreement perform an act or assistance to any act which may infringe or lead to the infringement of any of CRYE's proprietary rights.

56.    As set forth in Section 9(f) of the 2012 License Agreement, Sections 3 and 7 survived expiration of the Agreement and remains in effect.

57.    Despite being put on notice by Crye of its obligations to comply with the 2012 License Agreement, including Section 3(h) thereof, Bennettsville has breached, and continues to breach, the Agreement by printing and selling products expressly prohibited by §3(h) thereof, including but not limited to Scorpion W2 Products.

58.    Section 3(p) of the 2012 Agreement requires that all print screens shall be returned to Crye upon the expiration of the Agreement.

59.    Bennettsville has breached the 2012 License Agreement by failing to return the print screens to Crye.

60.    In Section 14(g) of the 2012 License Agreement, Bennettsville specifically "acknowledges that any breach of its obligations under this Agreement with respect to the proprietary rights or confidential information of CRYE will cause CRYE irreparable injury for which there are inadequate remedies at law, and therefore CRYE will be entitled to equitable relief in addition to all other remedies provided by this Agreement or available at law."

61.     Unless Bennettsville is enjoined from continuing to breach its continuing obligations under the expired 2012 License Agreement as alleged herein, Crye will be irreparably harmed.

62.     Crye has no adequate remedy at law with regard to Bennettsville's breach of its continuing obligations under the expired 2012 License Agreement.

63.     By reason of the foregoing, Bennettsville should be ordered to comply with its continuing obligations under the 2012 License Agreement, including but not limited to its obligation not to print and sell Scorpion W2 Products.

### Fourth Claim
### (Unjust Enrichment)

64.     Crye repeats and realleges each and every allegation contained in paragraphs 1 through 63 of this Complaint as if fully set forth herein.

65.     Bennettsville has printed and sold to a government contractor, fabric printed in Scorpion W2 without Crye's authorization or consent, and without compensating Crye.

66.     As a result, Bennettsville has been unjustly enriched at Crye's expense, and equity and good conscience require that restitution be made.

67.     By reason of the foregoing, Crye has suffered damages in an amount to be determined at trial.

### Fourth Claim
### (Common Law Unfair Competition—Misappropriation)

68.     Crye repeats and realleges each and every allegation contained in paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     The color palette, shapes and placement of shapes in MULTICAM were developed by Crye after extensive research, testing, and analysis and are Crye's sole property.

70. Scorpion W2 is a modification of MULTICAM that uses the color palette, shapes and placement of shapes found in MULTICAM.

71. By printing and selling Scorpion W2 Products without Crye's authorization or consent, Bennettsville is misappropriating Crye's labor, skills, and expenditures, and Crye's sole property, for its own commercial advantage to unfairly compete against Crye and its licensees.

72. Bennettsville's misappropriation of Crye's property to print Scorpion W2 Products is intentional, malicious, and in bad faith.

73. Unless Bennettsville is enjoined from misappropriating Crye's property to print and sell products Scorpion W2 Products or products incorporating another camouflage pattern using Crye's color palette, shapes or placement of shapes, Crye will be irreparably harmed.

74. Crye has no adequate remedy at law.

75. By reason of the foregoing, Bennettsville should be preliminarily and permanently enjoined from misappropriating Crye's property to print and sell Scorpion W2 Products or another camouflage pattern using Crye's color palette, shapes or placement of shapes, without Crye's express written authorization.

### Jury Demand

76. Crye demands a trial by jury.

### Prayer For Relief

WHEREFORE, Crye requests that judgment be entered against Bennettsville as follows:

1. Declaring that the 2014 License Agreement is a valid and binding agreement that between Crye and Bennettsville that remains in full force and effect;

2. Preliminarily and permanently enjoining Bennettsville from:

(i) printing or selling any products that are similar to the MULTICAM

through color palette, pattern or arrangement or placement of any elements incorporated in

MULTICAM, including but not limited to printing or selling Scorpion W2 Products, without

Crye's express written authorization;

> (ii)    misappropriating MULTICAM's color palette, shapes or placement of

shapes to make any modifications to MULTICAM, including but not limited to Scorpion W2,

without Crye's express written authorization;

3.    Requiring Bennettsville to return to Crye all print screens for the MULTICAM

camouflage pattern or modifications, embellishments, derivative works or other changes of or to

the MULTICAM camouflage pattern;

4.    An accounting of Bennettsville's sales of Scorpion W2 Products;

5.    Attorneys' fees and other expenses incurred by Crye in this action;

7.    Interest; and

8.    Such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       January 14, 2015

                                          GREENBERG TRAURIG, LLP

                                          By:_____
                                              Robert A. Horowitz
                                              horowitzr@gtlaw.com
                                              Lauren B. Grassotti
                                              grassottil@gtlaw.com
                                          200 Park Avenue
                                          New York, NY 10166
                                          Tel.: (212) 801-9200

                                          *Attorneys for Plaintiffs Crye Precision LLC
                                          and Lineweight LLC*

# EXHIBIT A

US00D592861S

(12) **United States Design Patent**
Crye et al.

(10) Patent No.: **US D592,861 S**
(45) Date of Patent: ** **May 26, 2009**

(54) **SUBSTRATE WITH CAMOUFLAGE PATTERN**

(75) Inventors: **Caleb Clark Crye**, Brooklyn, NY (US);
**Eric Owen Fehlberg**, Queens, NY (US)

(73) Assignee: **LineWeight LLC**, Brooklyn, NY (US)

(**) Term: **14 Years**

(21) Appl. No.: **29/268,831**

(22) Filed: **Nov. 14, 2006**

(51) LOC (9) Cl. ................................................. **05-02**
(52) U.S. Cl. ................................................. **D5/62**
(58) Field of Classification Search ...................... D5/1,
D5/2, 3, 7, 8, 11, 13, 14, 15, 16, 19, 20, 23,
D5/24, 25, 26, 27, 28, 30, 32, 35, 36, 37,
D5/39, 43, 46, 47, 49, 50, 52, 53, 54, 55,
D5/56, 57, 58, 59, 60, 61, 62, 63, 64, 65,
D5/66, 99; 428/95, 187, 198, 199, 540, 542.2,
428/919, 904.4; D2/749, 994; D6/582, 583,
D6/595, 596, 598, 603, 604, 605, 606, 608,
D6/613, 616, 617, 619, 622; D24/124, 125,
D24/126; D25/142, 152; 5/413 AM, 709;
162/109, 231; 156/148, 209; D7/396.4,
D7/396.5, 396

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D88,279 | S | 11/1932 | Willheim | |
| D90,049 | S | 5/1933 | Reiman | |
| 3,967,026 | A | 6/1976 | Dalblom | |
| 4,576,904 | A | 3/1986 | Anitole | |
| D297,076 | S | 8/1988 | Kolpin et al. | |
| D297,596 | S | 9/1988 | Marquart, Sr. | |
| D391,401 | S | * | 3/1998 | Josephs ........................ D5/58 |
| D391,402 | S | * | 3/1998 | Josephs ........................ D5/58 |
| D391,403 | S | * | 3/1998 | Josephs ........................ D5/58 |
| 5,972,479 | A | 10/1999 | Lehman | |

| | | | | |
|---|---|---|---|---|
| 6,061,828 | A | 5/2000 | Josephs | |
| 6,127,022 | A | 10/2000 | Pretorius | |
| D469,260 | S | 1/2003 | Hexels | |
| D471,720 | S | 3/2003 | Simmons | |
| D474,613 | S | 5/2003 | Hexels | |
| D474,897 | S | 5/2003 | Clausen et al. | |
| D487,848 | S | 3/2004 | Crye et al. | |
| D572,909 | S | * | 7/2008 | Crye et al. ...................... D5/62 |

OTHER PUBLICATIONS

U.S. Appl. No. 29/268,099, filed Oct. 30, 2006, Crye et al.

* cited by examiner

*Primary Examiner*—Robert M. Spear
*Assistant Examiner*—Barbara B Lohr
(74) *Attorney, Agent, or Firm*—Stiennon & Stiennon

(57) **CLAIM**

The ornamental design for a substrate with camouflage pattern, as shown and described.

**DESCRIPTION**

The file of this patent contains at least one drawing/photograph executed in color. Copies of this patent with color drawing(s)/photograph(s) will be provided by the Patent and Trademark Office upon request and payment of the necessary fee.

FIG. 1 is a plan view of a camouflage pattern showing our new design in color. A unit of the design is enclosed within the broken lines of the drawing; and,

FIG. 2 is a plan view of an alternative embodiment camouflage pattern showing our new design. A unit of the design is enclosed within the broken lines of the drawing, the design is not limited in coloration.

The broken lines in the drawings represent the boundaries of the claimed design and form no part thereof.

1 Claim, 2 Drawing Sheets
(1 of 2 Drawing Sheet(s) Filed in Color)



Case 1:15-cv-00221-FB-RER   Document 1   Filed 01/15/15   Page 16 of 50 PageID #: 16



*FIG. 1*

Case 1:15-cv-00221-FB-RER   Document 1   Filed 01/15/15   Page 17 of 50 PageID #: 17



*FIG. 2*

# EXHIBIT B

CONFIDENTIAL

## NON - EXCLUSIVE LICENSE AGREEMENT

This Agreement is made and entered into as of **9/10/2012** ("Effective Date") between Crye Precision, LLC, a New York Limited Liability Company and its affiliate LINEWEIGHT LLC, with their principal place of business at 63 Flushing Avenue, Brooklyn NY USA (collectively referred to herein as "CRYE"), and Licensee **BENNETTSVILLE PRINTING** maintaining its principal place of business at **5 SHAWS COVE SUITE 220, NEW LONDON, CT 06320** ("LICENSEE" and sometimes collectively referred to as the "PARTIES").

WHEREAS, CRYE is the trademark, copyright and patent owner of all proprietary interest in the camouflage pattern and technology called MultiCam® ("MULTICAM"); AND

WHEREAS, LICENSEE is in the business of printing textiles; AND

WHEREAS LICENSEE wishes to license MULTICAM in order to reproduce or transfer MULTICAM on the surfaces of products listed in Exhibit A ("PRODUCTS") solely for the Channels of Distribution set forth on Exhibit B (the "Channels of Distribution"). This Agreement pertains only to "PRODUCTS" as listed in Exhibit A and not to any other products developed, manufactured or distributed by LICENSEE, and the Agreement only covers Products in the Territory solely for the Channels of Distribution; AND

WHEREAS, LICENSEE desires to act as an independent distributor of PRODUCTS and licensor of MULTICAM under the terms and conditions set forth in this agreement;

NOW THEREFORE, in consideration of the mutual promises, covenants, warranties, and other good and valuable consideration set forth herein, the PARTIES agree as follows:

1. Definitions.

Certain words and terms as used in this Agreement shall have the meanings given to them by the definitions and descriptions in this paragraph, and such definitions shall be equally applicable to both the singular and plural forms of any of the words and terms herein defined.

   "Affiliates", with respect to CRYE or LICENSEE respectively, shall mean all persons or business entities, whether corporations, partnerships, joint ventures or otherwise, which now or hereafter own, or are owned or controlled, directly or indirectly by the same owners as Crye Precision, LLC or LICENSEE, respectively.

   "MULTICAM" is a camouflage pattern protected by U.S. copyright, U.S. patent, and known under a United States and certain foreign trademark registration as MULTICAM.

2. Appointment as Authorized Non-Exclusive LICENSEE

   a. Non-Exclusive Appointment. Subject to the terms of this Agreement, CRYE appoints LICENSEE, and LICENSEE accepts such appointment, as an independent, non-exclusive printer of PRODUCTS in and limited to the territory set forth in Exhibit C (the "TERRITORY") to be distributed solely in the Channels of Distribution. LICENSEE agrees that it will not make or authorize any use, direct or indirect, of the PRODUCT outside the Territory (other than within the Channels of Distribution) or outside the Channels of Distribution and that it will not sell PRODUCTS to person(s) who resell them outside the Territory (other than within the Channels of Distribution) or outside the Channels of Distribution.

   b. CRYE's Reserved Rights.  CRYE reserves all rights not expressly granted to LICENSEE hereunder, and specifically shall not be prevented from using and exploiting or granting third parties the right to use MULTICAM in any manner whatsoever, except as otherwise provided herein.

3. Obligations of LICENSEE.

   a. Marketing Material Approval.  LICENSEE will not use advertisements or marketing materials related to MULTICAM that have not been approved in writing by CRYE before use.

1

b. Unless otherwise agreed between the parties, LICENSEE is restricted from selling second quality goods except if allowed for use in the fulfillment of the specific contract in the Channel of Distribution. All second quality goods or materials that do not meet the specifications of MULTICAM or the specific contract in the Channel of Distribution must be destroyed at LICENSEE's expense. Proof of destruction must be kept on file at LICENSEE and be available to CRYE at any point in time.

c. Personnel. LICENSEE will designate a single point of contact responsible for the administration and communications related to this Agreement. LICENSEE must inform CRYE within one week of any change to the single point of contact designation.

d. Printing Plant. LICENSEE covenants and agrees that all printing of MULTICAM and the PRODUCTS will occur at its print plant located at [ _BENNETSVILLE, SC_ ], and that this facility is wholly owned and operated by LICENSEE.

e. Packaging. LICENSEE will distribute PRODUCTS with all packaging, labels, hang tags, marketing materials, warranties, and disclaimers as requested by Crye according to the terms and policies set forth in Exhibit D, and will instruct its customers as to the terms of such documents applicable to the PRODUCTS. The selv legend including the license identifier and MULTICAM brand must be present on all PRODUCTS. Cropping or omission of this print text is not permitted under this agreement.

f. Subcontractors. LICENSEE shall not without CRYE's prior written consent, given or withheld in CRYE's sole discretion sublicense to any third party the right to use or make derivatives of MULTICAM or any of CRYE's intellectual property.

g. Additional Covenants. LICENSEE will:

   i. conduct business in a manner that reflects favorably at all times on MULTICAM, the PRODUCTS and the good name, good will and reputation of CRYE;
   ii. avoid deceptive, misleading or unethical practices that are or might be detrimental to CRYE, PRODUCTS, MULTICAM or the public;
   iii. make no false or misleading representations or claims with regard to MULTICAM, CRYE or PRODUCTS;
   iv. not publish or employ, or cooperate in the publication or employment of, any misleading or deceptive advertising material with regard to CRYE, MULTICAM or PRODUCTS;
   v. make no representations, warranties or guarantees to customers or to the trade with respect to the specifications, features or capabilities of PRODUCTS or MULTICAM that are different than the literature distributed or approved by CRYE.

h. Intellectual Property. LICENSEE acknowledges and agrees that it will not disassemble, decompile, or reverse engineer MULTICAM or any other intellectual property right of CRYE, including patent, trademark and copyrights, licensed from CRYE or, during or after the term or expiration of this Agreement, make any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM. Furthermore, Licensee agrees that it shall not make any additions to, new renderings of, or modifications, embellishments, derivative works or other changes of or to MULTICAM or any other intellectual property rights of CRYE without CRYE's prior written consent and Licensee agrees that all such additions, renderings, modifications, embellishments, derivative works or otherwise shall be and remain the sole property of CRYE.

i. Compliance with Law. LICENSEE will comply with all applicable international, national, state, regional and local laws and regulations in performing its duties hereunder and in any of its dealings with respect to MULTICAM and PRODUCTS.

j. Compliance with U.S. Export Laws. LICENSEE acknowledges that all MULTICAM and PRODUCTS including documentation and other technical data are subject to export controls imposed by the U.S. Export Administration Act of 1979, as amended (the "Act"), and the regulations promulgated thereunder. To the extent LICENSEE has any right to do so, LICENSEE will not export or re-export (directly or indirectly) any PRODUCTS or

CONFIDENTIAL

documentation or other technical data therefore without complying with the Act and the regulations thereunder.

k. Governmental Approval. If any approval with respect to this Agreement, or the notification or registration thereof, will be required at any time during the term of this Agreement, with respect to giving legal effect to this Agreement in the TERRITORY, or with respect to compliance with exchange regulations or otherwise, LICENSEE will immediately take whatever steps may be necessary in this respect, and any charges incurred in connection therewith will be for the account of LICENSEE. LICENSEE will keep CRYE currently informed of its efforts in this connection.

l. Market Conditions. LICENSEE will advise CRYE promptly concerning any potential infringement of MULTICAM or other CRYE Intellectual Property.

m. Costs and Expenses. Except as expressly provided herein or agreed to in writing by CRYE and LICENSEE, LICENSEE will pay all costs and expenses incurred in the performance of LICENSEE's obligations under this Agreement.

n. Insurance. LICENSEE shall at all times while this Agreement is in effect and for two years thereafter, obtain and maintain at its own expense, from a qualified insurance carrier with a Best rating of at least "B", commercial general liability coverage, which includes as additional insured CRYE, with a minimum of $1,000,000 per occurrence per year and a maximum deductible of $10,000 per occurrence.

o. Channels of Distribution. LICENSEE agrees that it will not make or authorize any use, direct or indirect, of the PRODUCT outside the Territory (other than within the Channels of Distribution) or outside the Channels of Distribution and that it will not sell PRODUCTS to person(s) who sell or resell them outside the Territory or outside the Channels of Distribution. CRYE shall have the right at any time to inspect any sale of the PRODUCT, and to receive information regarding any customer of LICENSEE of the PRODUCT, to ensure compliance with this Section 2(o).

p. Print Screens. All print screens are and shall remain the property of CRYE, and shall be returned to CRYE upon the expiration or termination of this Agreement. If a print screen becomes damaged or otherwise unusable, CRYE will supply LICENSEE with a replacement screen(s). Replacement costs, including shipping and applicable taxes, will be at the expense of LICENSEE. Additional screens may be requested by the LICENSEE to facilitate production. CRYE reserves the right to charge for the service of providing additional screens.

4. Inspections, Records and Reporting.

a. Reports. Within thirty (30) days of the end of each calendar month, LICENSEE will provide to CRYE a written report showing, for the previous month, LICENSEE's point of sale report showing shipments of PRODUCTS by customer name, shipping address, part number of each fabric, fabric style, finished width of each fabric, number of linear yards of each fabric shipped, U.S. Department of Defense contract number and delivery order for each fabric shipped, licensing fee calculated for each fabric shipped based on yardage and finished width, and total licensing fee due for that month. LICENSEE shall provide a written report even if no material was shipped during that month.

b. Notification. LICENSEE will: (i) notify CRYE in writing of any claim or proceeding involving PRODUCTS within ten (10) days after LICENSEE learns of such claim or proceeding; and (ii) notify CRYE in writing not more than thirty (30) days after any change in the management of LICENSEE or any transfer of more than twenty-five percent (25%) of LICENSEE's voting control or a transfer of substantially all its assets.

c. Records. LICENSEE will maintain, for at least three years after termination of this Agreement, its records, contracts and accounts relating to distribution of PRODUCTS (the "Records"), and will permit examination thereof by authorized representatives of CRYE at all reasonable times.

CONFIDENTIAL

    d. **Inspection.** CRYE or its designee(s) shall be entitled to inspect areas of the printing plant designated in Section 3(d) that are used in the production, testing, shipping, storage, or disposal of PRODUCTS, from time to time upon five (5) days prior written notice to LICENSEE.

    e. **Audit.** CRYE or its designee shall be entitled to audit and inspect records pertaining to the Agreement at reasonable times upon five days prior written notice to LICENSEE and make copies and summaries of such Records. If CRYE discovers a deficiency in the amount owed to it under this Agreement, LICENSEE shall promptly pay such deficiency to CRYE and, if such deficiency is five percent (5%) or more of the amount paid to CRYE for such period, LICENSEE shall also reimburse CRYE for all reasonable costs and expenses incurred by CRYE in connection with such inspection.

5. **Prices, License Fees and Payment.**

    a. **Prices and License Fees.** During the term of this Agreement, LICENSEE shall have a license to print and use MULTICAM on PRODUCTS for a fee of $0.0275 per linear yard per inch finished width of fabric shipped. For example, if the finished width of fabric is 58 inches, then the license fee is $1.595 per linear yard of fabric shipped.

    b. **Payment Terms.** All payments shall be made in United States dollars, free of any currency control or other restrictions to CRYE at the address designated by CRYE. Unless otherwise agreed by CRYE in writing, LICENSEE will either pay by certified check or wire transfer to a bank account designated by CRYE the amount of the license fees of the PRODUCTS shipped (plus any applicable taxes, shipping and other charges) in the prior calendar month, payable within five days after the end of any calendar month; or, at CRYE's sole discretion, CRYE may agree to extend net 30 day terms. In any event, LICENSEE shall remit the corresponding monthly ship report as detailed in Section 4(a) above.

    c. **No Set-off.** LICENSEE will not set-off or offset against CRYE's invoices amounts that LICENSEE claims are due to it. LICENSEE will bring any claims or causes of action it may have in a separate action and waives any right it may have to offset, setoff or withhold payment for PRODUCTS. LICENSEE will notify CRYE in writing of any claims or causes of action it may have. CRYE will respond to any such written documentation within thirty (30) days.

6. **LICENSEE Determines Its Own Prices.** LICENSEE will be entirely free to determine the actual prices at which PRODUCTS will be sold or licensed to its customers, which may be made solely in the Channels of Distribution.

7. **Trademarks, Trade Names, Logos, Designations and Copyrights.**

    a. **Use During Agreement.** During the term of this Agreement and subject to the terms and conditions specified herein, CRYE grants to LICENSEE a nonexclusive, nontransferable, limited license to use, in the TERRITORY for the Channels of Distribution, CRYE and MULTICAM trademarks, trade names, logos and designations only as necessary for LICENSEE to fulfill its obligations hereunder. LICENSEE's use of such trademarks, trade names, logos and designations will be in accordance with CRYE's policies in effect from time to time, including but not limited to trademark usage and cooperative advertising policies. LICENSEE further agrees not to use any CRYE trademark, trade name, logo or designation in connection with any non-CRYE Product. CRYE reserves the right to review planned uses of its trademarks, trade names, logos and designations to confirm that they are within the guidelines, prior to usage of such trademarks by LICENSEE.

    b. **Copyright and Trademark Notices.** LICENSEE will include on each PRODUCT that it distributes, and on all containers and storage media thereof, all trademark, copyright and other notices of proprietary rights included required by CRYE on any and all PRODUCTS. LICENSEE agrees not to alter, erase, deface or overprint any such notice on anything provided by CRYE. LICENSEE also will include the appropriate trademark notices when referring to MULTICAM in advertising and promotional materials.

    c. **LICENSEE Does Not Acquire Proprietary Rights.** LICENSEE has paid no consideration for the ownership of CRYE's or its affiliates' trademarks, trade names, logos, designations or

4

copyrights, and nothing contained in this Agreement will give LICENSEE any right, title or interest in any of them. LICENSEE acknowledges that CRYE owns and retains all trademarks, trade names, logos, designations, copyrights and other proprietary rights in or associated with PRODUCTS, and agrees that it will not at any time during or after this Agreement assert or claim any interest in or do anything that may adversely affect the validity of any trademark, trade name, logo, designation or copyright belonging to or licensed to CRYE (including, without limitation any act or assistance to any act, which may infringe or lead to the infringement of any of CRYE's proprietary rights).

d.  No Continuing Rights.  Upon expiration or termination of this Agreement, LICENSEE will immediately cease all display, advertising and use of all CRYE and MULTICAM trademarks, trade names, logos and designations and will not thereafter use, advertise or display any trademark, trade name, logo or designation which is, or any part of which is, similar to or confusing with any trademark, trade name, logo or designation associated with CRYE or its affiliates. Notwithstanding the foregoing, so long as this Agreement is not terminated by CRYE for Cause, as set forth in Section 9(b) below, or is not automatically terminated as set forth in Section 9(c), LICENSEE shall be permitted to complete all existing open orders in the Channels of Distribution at the time of expiration or termination of the Agreement, provided, LICENSEE continues to comply with all the terms and conditions of this Agreement in fulfilling such open orders, including the payment of licensee fees to CRYE as set forth herein.

e.  Obligation to Protect.  LICENSEE agrees to use reasonable efforts to protect CRYE's proprietary rights and to reasonably cooperate at LICENSEE's expense in CRYE's efforts to protect its proprietary rights. LICENSEE agrees to promptly notify CRYE of any known or suspected breach of CRYE's proprietary rights that comes to LICENSEE's attention.

8.  Assignment.  This Agreement will not be assignable by LICENSEE, and LICENSEE may not delegate its duties hereunder without the prior written consent of CRYE. The provisions hereof shall be binding upon and inure to the benefit of the parties, their successors and permitted assigns. Any attempt to assign this Agreement in derogation of this Section 8 will be null and void.

9.  Duration and Termination of Agreement.

a.  Term.  This Agreement will begin on the Effective Date and will continue for two (2) years unless terminated earlier in accordance with the provisions hereof. Nothing shall be interpreted as requiring either party to renew or extend this Agreement.

b.  Termination for Cause.  CRYE may terminate this Agreement at any time prior to the expiration of its stated term in the event that:

  i.  LICENSEE defaults in any payment due to CRYE and such default continues unremedied for a period of thirty (30) days following written notice of such default;

  ii.  LICENSEE fails to perform any other obligation, covenant, warranty, duty or responsibility or is in default with respect to any term or condition undertaken by LICENSEE under this Agreement and such failure or default continues unremedied for a period of thirty (30) days following written notice of such failure or default;

  iii.  LICENSEE is merged, acquired, consolidated, sells all or substantially all of its assets, or implements or suffers any substantial change in management or control.

c.  Automatic Termination.  This Agreement terminates automatically, with no further act or action of either party, if: (1) a receiver or trustee is appointed for LICENSEE or its property or LICENSEE is adjudged bankrupt, (2) LICENSEE makes an assignment for the benefit of its creditors, (3) LICENSEE becomes the subject of a voluntary petition in bankruptcy or any voluntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, (4) LICENSEE becomes the subject of an involuntary petition in bankruptcy or any involuntary proceeding relating to insolvency, receivership, liquidation, or composition for the benefit of creditors, if such petition or proceeding is not dismissed within sixty (60) days of filing, or (5) LICENSEE is liquidated or dissolved.

5

CONFIDENTIAL

d. Effect of Termination or Expiration. Upon termination or expiration of this Agreement:

i. CRYE, will have first right of refusal to reacquire any or all PRODUCTS then in LICENSEE's possession that are not committed for sale under open orders as set forth above in Section 7(d), at prices not greater than the prices paid by LICENSEE for such Products.

ii. The due dates of all outstanding invoices to LICENSEE for PRODUCTS automatically will be accelerated so they become due and payable on the effective date of termination, even if longer terms had been provided previously.

iii. For a period of three (3) years after the date of termination or expiration, LICENSEE shall make available to CRYE for inspection and copying all books and records of LICENSEE that pertain to LICENSEE's performance of and compliance with its obligations, warranties and representations under this Agreement.

iv. LICENSEE shall cease using any CRYE trademark, trade name, trade dress, service mark, service name, logo or designation.

e. No Damages For Termination or Expiration. NEITHER CRYE NOR LICENSEE SHALL BE LIABLE TO THE OTHER FOR DAMAGES OF ANY KIND, INCLUDING INCIDENTAL OR CONSEQUENTIAL DAMAGES, ON ACCOUNT OF THE TERMINATION OR EXPIRATION OF THIS AGREEMENT IN ACCORDANCE WITH THIS SECTION 9. LICENSEE WAIVES ANY RIGHT IT MAY HAVE TO RECEIVE ANY COMPENSATION OR REPARATIONS ON TERMINATION OR EXPIRATION OF THIS AGREEMENT UNDER THE LAW OF THE TERRITORY OR OTHERWISE, OTHER THAN AS EXPRESSLY PROVIDED IN THIS AGREEMENT. Neither CRYE nor LICENSEE will be liable to the other on account of termination or expiration of this Agreement for reimbursement or damages for the loss of goodwill, prospective profits or anticipated income, or on account of any expenditures, investments, leases or commitments made by either CRYE or LICENSEE or for any other reason whatsoever based upon or growing out of such termination or expiration. LICENSEE acknowledges that (i) LICENSEE has no expectation and has received no assurances that any investment by LICENSEE in the promotion of PRODUCTS will be recovered or recouped or that LICENSEE will obtain any anticipated amount of profits by virtue of this Agreement, and (ii) LICENSEE will not have or acquire by virtue of this Agreement or otherwise any vested, proprietary or other right in the promotion of PRODUCTS or in "goodwill" created by its efforts hereunder. THE PARTIES ACKNOWLEDGE THAT THIS SECTION HAS BEEN INCLUDED AS A MATERIAL INDUCEMENT FOR CRYE TO ENTER INTO THIS AGREEMENT AND THAT CRYE WOULD NOT HAVE ENTERED INTO THIS AGREEMENT BUT FOR THE LIMITATIONS OF LIABILITY AS SET FORTH HEREIN.

f. Survival. CRYE's rights and LICENSEE's obligations to pay CRYE all amounts due hereunder, as well as LICENSEE's obligations under Section 3, Section 4, Section 7, Section 9(d), Section 9(e), this Section 9(f), and Sections 11-14 shall survive termination or expiration of this Agreement.

10. Relationship of the Parties. LICENSEE's relationship with CRYE during the term of this Agreement will be that of an independent contractor. Nothing in this Agreement will be construed as creating or implying a partnership, joint venture, employment, franchise, agency, or any other form of legal association (other than as expressly set forth herein) between the parties. LICENSEE will not have, and will not represent that it has, any power, right or authority to bind CRYE, or to assume or create any obligation or responsibility, express or implied, on behalf of CRYE or in CRYE's name, except as herein expressly provided.

11. Indemnification. Indemnification of CRYE. During and after the Term hereof, LICENSEE shall indemnify and hold harmless CRYE, and its successors and assigns, parents, subsidiaries, affiliates, officers, directors, representatives, employees and agents (collectively, the "CRYE PARTIES") (including paying all reasonable attorneys' fees and costs of litigation), from and against and hold CRYE harmless from, any and all claims, liabilities, demands, causes of action, judgments, settlements and expenses, arising out of or in connection with (a) the PRODUCTS, or (b) the breach of any representation, warranty or covenant made by LICENSEE hereunder, or (c) any other omissions or misrepresentations by LICENSEE to CRYE.

6

CONFIDENTIAL

12. Disclaimer of Warranties.

    a.   Disclaimer of Warranties. TO THE EXTENT PERMITTED BY APPLICABLE LAW, ALL IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT, ARE HEREBY DISCLAIMED BY CRYE.

    b.   LICENSEE Warranty. LICENSEE will make no warranty, claim, guarantee or representation, whether written or oral, on CRYE's behalf.

13. Proprietary Information. LICENSEE acknowledges that in the course of performing its obligations under this Agreement, it may obtain information relating to CRYE and MULTICAM which is of a confidential and proprietary nature to CRYE ("Proprietary Information"). Such Proprietary Information includes without limitation design patents, copyrights, trademarks, trade secrets, know-how, formulas, compositions of matter, inventions, techniques, processes, programs, diagrams, schematics, customer and financial information and sales and marketing plans, and specifically the print screen provided by CRYE to LICENSEE. LICENSEE will (a) use such Proprietary Information only in connection with fulfilling its obligations under this Agreement, (b) during the term of this Agreement and for a period of ten (10) years thereafter, hold such Proprietary Information in strict confidence and exercise due care with respect to its handling and protection of such Proprietary Information, consistent with its own policies concerning protection of its own proprietary and/or trade secret information and (c) disclose, divulge or publish the same only to such of its employees or representatives as are Qualified Personnel (as defined below) and to no other person or entity, whether for its own benefit or for the benefit of any other person or entity. LICENSEE further agrees to return all copies of all Proprietary Information in its possession, control or custody immediately upon termination or expiration of this Agreement. As used herein, the term "Qualified Personnel" means such employees and representatives of LICENSEE who (i) have a need to know or have access to CRYE's Proprietary Information in order for such employees or representatives to carry out the purposes of this Agreement and (ii) have executed nondisclosure agreements binding them not to use or disclose such Proprietary Information except as permitted herein.

14. General Provisions.

    a.   Waiver. The waiver by either party of any default by the other shall not waive subsequent defaults of the same or different kind.

    b.   Notices. All notices and demands hereunder will be in writing and will be served by personal service, mail or confirmed facsimile transmission at the address of the receiving party set forth in this Agreement (or at such different address as may be designated by such party by written notice to the other party). All notices or demands by mail shall be by certified or registered airmail, return receipt requested, and shall be deemed complete upon receipt.

    c.   Attorneys' Fees. In the event any litigation is brought by either party in connection with this Agreement, the prevailing party in such litigation shall be entitled to recover from the other party all the costs, reasonable attorneys' fees and other expenses incurred by such prevailing party in the litigation.

    d.   Execution of Agreement, Controlling Law, Jurisdiction and Severability. This Agreement will become effective only after it has been signed by LICENSEE and has been accepted by CRYE at its principal place of business, and its effective date shall be the date on which it is signed by CRYE. It shall be governed by and construed in accordance with the laws of the State of New York. Any suit hereunder will be brought in the federal or state courts in the Southern District of New York and LICENSEE hereby submits to the personal jurisdiction thereof. The English-language version of this Agreement controls when interpreting this Agreement. LICENSEE consents to the enforcement of any judgment rendered in the United States in any action between LICENSEE and CRYE. Any and all defenses concerning the validity and enforceability of the judgment shall be deemed waived unless first raised in a court of competent jurisdiction in the United States.

CONFIDENTIAL

e.  Severability. In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be unenforceable, such provision will be enforced to the maximum extent permissible and the remaining portions of this Agreement shall remain in full force and effect.

f.  Force Majeure. CRYE and LICENSEE shall not be responsible for any failure to perform due to unforeseen circumstances or to causes beyond the PARTIES reasonable control, including but not limited to acts of God, war, riot, embargoes, acts of civil or military authorities, fire, floods, accidents, strikes, failure to obtain export licenses or shortages of transportation, facilities, fuel, energy, labor or materials. In the event of any such delay, the PARTIES may defer their obligations under this agreement for a period equal to the time of such delay or up to three (3) months.

g.  Equitable Relief. LICENSEE acknowledges that any breach of its obligations under this Agreement with respect to the proprietary rights or confidential information of CRYE will cause CRYE irreparable injury for which there are inadequate remedies at law, and therefore CRYE will be entitled to equitable relief in addition to all other remedies provided by this Agreement or available at law.

h.  Entire Agreement. This Agreement constitutes the complete and exclusive agreement between the parties pertaining to the subject matter hereof, and supersedes in their entirety any and all written or oral agreements previously existing between the parties with respect to such subject matter. LICENSEE acknowledges that it is not entering into this Agreement on the basis of any representations not expressly contained herein. Any modifications of this Agreement must be in writing and signed by both parties hereto. Any such modification shall be binding upon CRYE only if and when signed by one of its duly authorized officers.

i.  Release of Claims. Any and all claims against CRYE arising under prior agreements, whether oral or in writing, between CRYE and LICENSEE are waived and released-by LICENSEE by acceptance of this Agreement.

j.  Choice of Language. The original of this Agreement has been written in English. LICENSEE waives any right it may have under the law of any territory LICENSEE may have a corporate or legal presence in.

k.  Due Execution. The party executing this Agreement represents and warrants that he or she has been duly authorized under LICENSEE's charter documents and applicable law to execute this Agreement on behalf of LICENSEE.

l.  Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

m.  Captions. The captions to sections of this Agreement have been inserted for identification and reference purposes only and shall not be used to construe or interpret this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective on the date specified below.

CRYE PRECISION LLC

Signature:

Printed Name: Gregg Thompson

Title: Director

Date: 4/10/12

8

CONFIDENTIAL

LICENSEE   BENNETTSVILLE   PRINTING

Signature:

Printed Name:   RON LEVINE

Title:   VP

Date:   4-5-12

9

CONFIDENTIAL

## EXHIBIT A - PRODUCTS

**MultiCam Fabrics**

CONFIDENTIAL

## EXHIBIT B – CHANNELS OF DISTRIBUTION

CRYE acknowledges that LICENSEE is selling PRODUCT to vendors that manufacture articles from such Product. LICENSEE acknowledges, however, that the PRODUCT is to be used only in the authorized Channels of Distribution set forth below, and LICENSEE will use reasonable efforts to determine the intended use of the PRODUCT prior to selling any PRODUCT to any third party. The Channels of Distribution are the following:

1. In Fulfillment of contracts issued by the United States Department of Defense

CONFIDENTIAL

## EXHIBIT C -- TERRITORY

**United States**

12

CONFIDENTIAL

## EXHIBIT D – PACKAGING INFORMATION

LICENSEE is required to tag all rolls and less than roll quantities with a single hangtag provided by CRYE such that it clearly visible once the material is opened.

13

# EXHIBIT C



## Intellectual Property License Agreement

THIS INTELLECTUAL PROPERTY LICENSE AGREEMENT (the "Agreement") is entered into as of the __30__ day of __MAY__, 20_14_ (the "Effective Date"), between CRYE PRECISION LLC, with its principal place of business located at 63 Flushing Avenue, Unit 252, Brooklyn, New York 11205 ("Crye"), and __BENETTSVILL OTLNTIN__ with its principal place of business located at __55 HAWS COVE STE 220__ ("Licensee").
__NEW LONDON, CT 06320__

WHEREAS, LineWeight LLC ("LineWeight") is the owner of valuable intellectual property rights tied to a family of camouflage patterns commonly known as "MultiCam" (as set forth on Schedule A, collectively, the "IP"). Crye is the sister company of LineWeight and is the exclusive Licensor of the IP; and

WHEREAS, Licensee wishes to develop and manufacture, for commercial and/or governmental sale, certain products which require the use of the IP (as detailed on Schedule B attached hereto and made a part hereof, the "Products"); and

WHEREAS, Crye has agreed, subject to the terms of this Agreement, to grant Licensee certain non-exclusive limited licenses to the practice the IP such that Licensee can develop and sell the Products.

NOW THEREFORE, the parties to this Agreement agree as follows.

### 1. Grant and Scope of Limited Licenses.

1.1.    Subject to Section 2.1 below and all of the other terms and conditions of this Agreement, effective from and after the Effective Date, Crye hereby grants to Licensee, and Licensee hereby accepts from Crye, a non-exclusive limited license to practice the IP in connection with making certain Government and Commercial Sales (as those terms are defined in Section 1.2 and Section 1.3 below) of the Products listed on Schedule B.

1.2.    A "Government Sale" shall mean any sale pursuant to which the Products are: (i) "Source Sampled" by an authorized United States government representative; and (ii) tested for shade and pattern execution by a Government approved laboratory. In addition, for a sale to constitute a Government sale, there must be a DD1222 confirming the passing test results detailed in this Section 1.2.

1.3.    A "Commercial Sale" shall mean any sale other than a Government Sale.

1.4.    Notwithstanding the provisions of Section 1.1 above, Licensee shall have no right to manufacture or sell variations or modifications of any Products, or any pending or future Products, unless and until those Products have been (i) added to Schedule B (by way of an amendment signed by each of the parties hereto), and (ii) assigned a licensing fee as provided for in Section 3 and Schedule E.

1.5.    In connection with the limited license granted in Section 1.1 above, Crye is additionally granting Licensee a non-exclusive limited license to utilize Crye's various "MultiCam Artwork Packages" (the "MCAP's"), which may be delivered to Licensee from time to time after the execution of this Agreement. The MCAP's are being licensed to Licensee for the sole purpose of permitting Licensee to manufacture the Products according to Crye's specifications.

1.6.    Licensee agrees that all MCAP's and/or MultiCam print screens (which may be delivered to Licensee from time to time during the term of this Agreement) shall remain the property of Crye, and that they shall be returned to Crye upon the expiration or termination of this Agreement. If a print screen becomes damaged or otherwise unusable, Crye will supply Licensee with a replacement screen(s). Replacement costs for print screens, including shipping and applicable taxes, will be at Licensee's expense. Additional screens may be requested by Licensee to facilitate production.

1.7    Licensee shall not, directly or indirectly, at any time during the term of this Agreement or thereafter, do or cause to be done any act which may in any way jeopardize or adversely affect the validity or enforceability of the IP. Except as expressly provided herein, Licensee is granted no rights or licenses whatsoever in or to the IP, or in any of Crye's or LineWeight's (or their affiliates') other intellectual, proprietary or personal rights.

1

Crye Version 1.1



1.8.     With the exception of Crye's grant of rights to practice the IP and utilize the MCAP's and MultiCam print screens, Licensee understands and acknowledges that Crye has not licensed any other rights which may be required for the use and distribution of the Products, including, without limitation, rights to any intellectual property owned by third parties. In addition, nothing herein shall be deemed as granting Licensee the right to practice the IP in connection with the development, manufacture or sale of any product other than the Products.

1.9.     The limited license granted herein to practice the IP and to utilize the MCAP's and MultiCam print screens are personal to Licensee and may not be transferred or assigned without the prior written consent of Crye. Any unauthorized sale, assignment or sublicense of the IP without such consent will be null and void. Any dissolution, merger, consolidation or other reorganization of Licensee shall be deemed an assignment.

1.10.    Neither the limited license granted herein, nor any of the other provisions of this Agreement, shall be deemed to grant Licensee any rights to use Crye's name, any abbreviations, words, or images that apparently refer to Crye, or any trademark or service mark owned by Crye without first obtaining Crye's prior written consent.

1.11.    Licensee shall distribute the Products with any and all packaging, labels, hang tags, marketing materials, warranties and disclaimers as may be requested by Crye.  In addition, a selv legend which includes the license identifier and MultiCam™ brand must be present on all Products.

1.12.    Licensee shall notify Crye of any deviations in quality that may occur during the manufacturing, packaging or application of the Products, within twenty-four (24) hours of discovery of such deviation. In no event shall Licensee sell, display, market, distribute or use, for any purpose, or permit any third party to sell, any Product which is damaged, defective, or otherwise not in compliance with the quality standards set forth in <u>Schedule D</u>. Upon Licensee's (or Crye's) detection of a Product that fails to meet the quality standards set forth in <u>Schedule D</u>, then Licensee shall immediately cease further production and/or sale of the same, and Licensee shall have no further right to produce or sell any such Product unless or until the quality of the Product is brought back into full compliance with the quality standards set forth in <u>Schedule D</u>.

## 2. First Article(s) and Production Quality Requirements for Commercial Sales.

2.1.     Licensee's rights hereunder make Commercial Sales of the Products are conditioned upon:

2.1.1.    Licensee providing Crye with samples of the Products (along with any and all related paperwork, packaging and promotional materials), in accordance with the First Article Quality Requirements set forth on <u>Schedule C</u>;

2.1.2.    Licensee receiving Crye's written approval for said Products (which shall be evidenced by Licensee's receipt from Crye of a completed Licensing Fee form (a template of which is attached hereto as <u>Schedule E</u>));

2.1.3.    Licensee signing and returning the Licensing Fee form to Crye; and

2.1.4.    Licensee strictly adhering to, and complying with, the MultiCam Production Quality Control Requirements set forth on <u>Schedule D</u>.

2.2.     The requirements set forth in <u>Section 2.1</u> above, and the terms of <u>Schedule C</u> and <u>Schedule D</u>, shall not apply to Government Sales.

## 3. Licensing Fee and Reporting.

3.1.     Licensee acknowledges that in consideration of Crye's grant to it of the licenses necessary to manufacture the Products, Licensee shall be required to pay Crye licensing fees for all Products sold, as further detailed on <u>Schedule E</u>, attached hereto and made a part hereof (the "Licensing Fees"). Crye reserves the right to change the Licensing Fees from time to time, upon sixty (60) days' written notice to the Licensee.

3.2.     The total Licensing Fee owed to Crye shall be calculated on a monthly basis (each referred to herein as a "Licensing Fee Period"). The Licensing Fee shall be payable no later than thirty (30) days after the end of each Licensing

2



Fee Period. Late payments shall incur interest at the rate of five percent (5.0%) per month. Any returns of Products shall be reported to Crye on a monthly basis, and Crye shall refund any Licensing Fee payments made by Licensee for said Products.

3.3.     At the end of each Licensing Fee Period, together with the Licensing Fee payment, Licensee shall deliver to Crye a full and accurate report of all Products sold. Said report shall show, for the previous Licensing Fee Period, Licensee's point of sale report showing shipments of Products by customer name, shipping address, part number of each fabric, fabric style. finished width of each fabric, number of linear yards of each fabric shipped, and the Licensing Fee calculated for each fabric shipped based on yardage and finished width, along with the total Licensing Fee due for that month. In addition, for each Government Sale listed on the report, Licensee shall list the corresponding U.S. Department of Defense contract number and delivery order. Said report shall be furnished regardless of whether Licensee has received any payment for said Products, and regardless of whether any Products were actually sold or transferred during the Licensing Fee Period. Upon Crye's written request, Licensee shall provide Crye with copies of all invoices for the Products sold during the prior Licensing Fee Period.

3.4.     Licensee agrees that Licensing Fees shall be paid for all Products delivered or sold, whether in furtherance of a Commercial Sale or a Government Sale, and irrespective of whether Licensee actually receives payment for said Products. Licensing Fees shall be deemed to accrue when the Product is shipped.

3.5.     Licensee's obligation to pay the Licensing Fees shall survive expiration or termination of this Agreement and shall continue for as long as Licensee continues to manufacture Products.

3.6.     All payments made by Licensee to Crye pursuant to this Agreement shall be exclusive of any federal, state, municipal or other governmental taxes, duties, licenses, fees, excises or tariffs now or hereafter imposed on Licensee's acquisition, production, storage, sale, transportation, import, export or use of the Products. All such taxes shall be paid by, and are the sole responsibility of, the Licensee.

**4.  Audit.**

4.1.     Crye shall have the right, upon reasonable notice, to inspect Licensee's books, records and all other materials in Licensee's possession that contain information relating to this Agreement. If such inspection reveals an underpayment by Licensee of the Licensing Fees owed to Crye, Licensee shall promptly pay the difference to Crye. If such deficiency is in excess of five percent (5%) of the Licensing Fees due for any Licensing Fee Period, Licensee shall also (i) pay Crye interest on such deficiency calculated at the rate of ten percent (10%) per month from the date such Licensing Fees were originally due; and (ii) reimburse Crye for the cost of the services of the representatives conducting the audit and for all other costs relating to the audit, including but not limited to, reasonable travel expenses.

4.2.     Licensee shall keep records showing the calculation and amounts of all Licensing Fees paid. All records relative to Licensee's obligations hereunder shall be maintained and made accessible to Crye for inspection for at least three (3) years after termination of this Agreement.

4.3.     The receipt or acceptance by Crye of any Licensing Fee payment or Licensing Fee statement shall not prevent Crye from subsequently challenging the validity or the accuracy of such payment or statement.

**5.  Channels of Distribution and Territory.** As of the date of this Agreement, Licensee may only sell or transfer Products within the channels of distribution and territories set forth on Schedule F attached hereto and made a part hereof. Licensee recognizes the considerable value and goodwill tied to the IP, and acknowledges that any use or sale of the Products in a manner inconsistent with Crye's high standards could result in significant damages to Crye. To this end, Crye reserves the right, in its sole and absolute discretion, to change the scope of the channels of distribution and/or the territories listed on Schedule F, at any time, for any or no reason, upon written notice to Licensee, and Licensee waives any and all rights to contest the same. In addition, Crye shall have the right, in its sole and absolute discretion, to prohibit licensee from selling Products to specific customers (individual or companies).

3

Crye Version 1.1



## 6.  Term and Termination.

6.1.     This Agreement is effective as of the Effective Date and shall remain in full force and effect for two (2) years. Thereafter, this Agreement will automatically renew for additional two (2) year periods, unless either party provides written notice, at least thirty (30) days prior to the end of the then current term, of its desire not to renew the Agreement.

6.2.     Either party may terminate this Agreement upon ten (10) days written notice to the other party if the other party: (a) is in breach of this Agreement and fails to cure said breach within twenty (20) days after receipt of written notice by the other party reasonably detailing said breach (and provided, however, that neither party shall be obligated to notify the other party of a breach more than twice in any calendar year); (b) becomes insolvent or admits inability to pay its debts generally as they become due; (c) becomes subject, voluntarily or involuntarily, to any proceeding under any bankruptcy or insolvency law, which is not fully stayed within ten business days or is not dismissed or vacated within 30 days after filing; (d) is dissolved or liquidated or takes any corporate action for such purpose; (e) makes a general assignment for the benefit of creditors; or (f) has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

6.3.     Upon termination of this Agreement for any reason, any and all rights acquired by Licensee relating to the practice of the IP shall terminate and cease absolutely, and Licensee shall immediately cease all sales of the Products. In addition, within thirty (30) days after the termination of this Agreement, Licensee shall remit to Crye any unpaid and outstanding License Fees and submit a written statement sworn by an officer of Licensee attesting that the obligations set forth in this Section 6.3 have been met.

7.  **Restriction on Similar Products.** Except for the Products for which Crye shall be entitled to receive Licensing Fees, Licensee agrees that it shall not, at any time during the term of this Agreement or at any time thereafter, make or provide, or assist or encourage others to make, products which are confusingly similar in design or appearance (i.e., color palette, arrangement or placement of elements) to, or which constitute derivative works of, any of the IP.

8.  **No Exceptions.** Licensee agrees and acknowledges that under no circumstances shall Licensee be relieved of its obligations under to this Agreement, including, but not limited to, Licensee's obligation to pay Crye Licensing Fees for all Products sold or delivered, irrespective of whether payment is received by Licensee for the Products.

9.  **Limitation of Liability.** CRYE WILL NOT BE LIABLE TO LICENSEE FOR ANY DAMAGES OF ANY KIND, INCLUDING WITHOUT LIMITATION, SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES INCURRED OR SUFFERED ARISING AS A RESULT OF OR RELATED TO LICENSEES PRACTICE OF THE IP, WHETHER IN CONTRACT, TORT OR OTHERWISE, EVEN IF CRYE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES.

10.  **Export Compliance.** Licensee shall not export any information or Products received or made in furtherance of this Agreement without first complying with all requirements of US Export Administration Regulations including the International Traffic in Arms Regulations and the Export Administration Regulations, including the requirement for obtaining any export license, if applicable. Licensee shall defend, indemnify and hold Crye harmless from all claims, demands, damages, costs, fines , penalties, attorney's fees and all other expenses and costs arising from Receiving Party's failure to comply with this paragraph, the Arms Export Control Act, the Export Administration Act and applicable regulations, or other applicable regulations.

11.  **Indemnification.** Licensee shall hold harmless and indemnify Crye against any and all expense, loss or liability (including court costs and reasonable attorneys' and experts' fees and expenses, including but not limited to expenses, if any, incurred in enforcing this provision) incurred by or sought to be collected from Crye by reason of damage or injury arising from any act or omission of Licensee or from the breach of any provision in this Agreement or the breach or inaccuracy of any warranty or representation made under this Agreement.

12.  **Relation of Parties.** Nothing in this Agreement will (i) create or imply an agency, joint venture or partnership relationship between Crye and Licensee; (ii) be deemed to preclude Crye from entering into agreements with or otherwise engaging other parties in the business of selling products similar to those of the Licensee; or (iii) be deemed to grant either party any right or authority to bind or obligate the other party in any manner to any third party.

4

Crye Version 1.1



**13. Remedies.** Licensee agrees that Crye's remedies at law for breach of the provisions of <u>Section 1</u>, <u>Section 2</u>, <u>Section 3</u>, <u>Section 5</u>, <u>Section 6</u>, <u>Section 7</u>, <u>Section 8</u>, <u>Section 9</u>; <u>Section 10</u> and <u>Section 14</u> of this Agreement are inadequate and that Crye shall be entitled to equitable relief, including, without limitation, injunctive relief and/or specific performance, in addition to the remedies provided by contract and/or by law. If any litigation is necessary to enforce the terms of this Agreement, the losing party shall reimburse the prevailing party for its reasonable attorneys' fees and costs.

**14. Miscellaneous.**

**14.1. Facilities.** All Products manufactured pursuant to this Agreement shall be manufactured at the facility(s) listed on <u>Schedule B</u>, and at any other facility(s) pre-approved by Crye in its sole discretion. Crye shall be entitled to inspect areas of the facility(s) listed on <u>Schedule B</u> upon reasonable notice to Licensee.

**14.2. Confidentiality.** Licensee acknowledges that the terms and existence of this Agreement constitutes confidential information, and Licensee shall not discuss or disclose the existence of the Agreement to any third party.

**14.2. Survival.** The provisions of <u>Section 1</u>, <u>Section 3</u>, <u>Section 4</u>, <u>Section 6</u>, <u>Section 7</u>, <u>Section 9</u>, <u>Section 10</u>, <u>Section 11</u>, <u>Section 12</u>, <u>Section 13</u> and this <u>Section 14</u> shall survive termination of this Agreement.

**14.3. Representations and Warranties.** Licensee represents and warrants that (i) it has obtained all necessary approvals, consents and authorizations to enter into this Agreement and to perform and carry out its obligations under this Agreement; and (ii) the person executing this Agreement on Licensee's behalf, as an officer of Licensee, has express authority to do so and to bind Licensee.

**14.4. Severability.** If any term of this Agreement is found to be unenforceable or contrary to law, it will be modified to the least extent necessary to make it enforceable, and the remaining portions of this Agreement will remain in full force and effect.

**14.5. Headings.** The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

**14.6. No Waiver.** Neither the waiver by any party of any breach of obligation, nor any delay and/or failure to exercise any right, power or privilege hereunder shall operate as a waiver thereof, nor shall it operate as a waiver of any succeeding breach or other obligation. All waivers must be made in writing by the party waiving its rights.

**14.7. Entire Agreement.** This Agreement, together with any schedules referred to herein, constitute the entire agreement between the parties with respect to its subject matter, and supersedes all prior agreements, proposals, representations or communications relating to the subject matter. This Agreement may be modified only by a written instrument executed by authorized representatives of the parties hereto.

**14.8. Governing Law.** This Agreement is governed by and shall be construed in accordance with the laws of the State of New York, without giving effect to its conflicts of law provisions, and any litigation arising out of or in connection in any way with this agreement shall take place in a State or Federal court of competent jurisdiction in the State of New York. Section captions are for reference only and shall not be considered in construing this Agreement.

**14.9. Incorporation of Recitals.** The recitals of this Agreement are incorporated herein and made a part hereof by this reference thereto.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date set forth below.

CRYE PRECISION LLC

By: _____
Gregg Thompson, Member

By: _BENNETTSVILL PRINTING_
, its
_VICE PRESDENT_

5

Crye Version 1.1



**Schedule A**
**MultiCam Intellectual Property**

US Patents: D,487,848; D592,861; D560,915 and D572,909

US Copyright Office Registration Numbers: VA-1-205-145 and VA-1-192-640.

US Copyright Office Application Numbers: 1-1130883822; 1-1130883869; 1-1130883945; 1-1130883991; 1-1130904301; 1-1130904357; 1-1130778235 and 1-1130778235

US Design Trademarks: 85/902531; 86/161754; 86/161503; 86/161550; 86/161774; 86/161787; 86/161800; 86/161810; 86/161503; 86/160311; 86/160412; 86/161594; 86/161631; 86/160445; 86/161357; 86/161381 and 86/161402

6

Crye Version 1.1



### Schedule B
### Products, Facilities and Points of Contact

**I.**   **Products for Commercial Sale**

| PRODUCT DESCRIPTION | ITEM NUMBER |
|---|---|
| NYCO RIPSTOP — MULTICAM | BVPC PC 101 |
| NYCO TWILL — MULTICAM | BVPC PC 102 |
| NYCO RIPSTOP — MULTICAM BLACK | BVPC PC 103 |
| NYCO TWILL — MULTICAM BLACK | BVPC PC 104 |
| NYCO RIPSTOP — MULTICAM ARID | BVPC PC 105 |
| NYCO TWILL — MULTICAM ARID | BVPC PC 106 |
|  |  |
|  |  |
|  |  |
|  |  |

**II.**   **Products for Government Sale**

| PRODUCT DESCRIPTION | ITEM NUMBER |
|---|---|
| NYCO RIPSTOP MULTICAM | BVPCPM 101 |
| NYCO TWILL MULTICAM | BVPCPM 102 |
| NYCO RIPSTOP MULTICAM BLACK | BVPCPM 105 |
| NYCO TWILL MULTICAM BLACK | BVPCPM 106 |
| NYCO RIPSTOP MULTICAM ARID | BVPCPM 103 |
| NYCO TWILL MULTICAM ARID | BVPCPM 104 |
| NYCO RIPSTOP MULTICAM TROPICAL | BVPCPM 107 |
| NYCO TWILL MULTICAM TROPICAL | BVPCPM 108 |
| NYCO RIPSTOP MULTICAM ALPINE | BVPCPM 109 |
| NYCO TWILL MULTICAM ALPINE | BVPCPM 110 |

**III.**   **Facilities**

All Products to be produced or provided during the term of this Agreement shall be manufactured and/or provided at the following facility(s), which Licensee represents are wholly owned and/or operated by the Licensee:

BENNETTSVILLE PRINTING

**IV.**   **Licensee Point of Contact**

The following person(s) shall be Licensee's point(s) of contact responsible for the administration and communications related to this Agreement. Licensee shall inform Crye within one week of any changes to the point(s) of contact designation.

RONALD H. LEVINE

7

Crye Version 1.1



**Schedule C**
**Commercial Sales - First Article(s)**

**I.      First Article Approval**

a.   Upon the execution of this Agreement, Crye will deliver to Licensee the "First Article MCAP", and, as soon thereafter as possible, Licensee shall deliver to Crye, zero-defect samples of each of the Products described in Schedule B above (the "First Article"). Each First Article shall be produced in accordance with the First Article Quality Control Requirements set forth in Section II below. The number of First Articles to be furnished by Licensee shall initially be as set forth below:

**Commercial Products**

| PRODUCT DESCRIPTION | ITEM NUMBER | # OF FIRST ARTICLES |
|---|---|---|
| NYCO RIPSTOP MULTICAM | BVPcPc 101 | 1 |
| | BVPcPc 103 | 1 |
| | BVPcPc 105 | 1 |
| | BVPcPM 101 | 1 |
| | BVPcPM 103 | 1 |
| | BVPcPM 105 | 1 |
| | | |
| | | |
| | | |
| | | |

b.   Licensee shall additionally submit, for Crye's written approval, any and all packaging and promotional materials relating to the Products, including, without limitation, any and all images, videos, instructional materials or depictions of Crye's name or logos.

c.   If Crye fails to approve any First Article within fifteen (15) days of Crye's receipt of the same, said failure shall constitute disapproval of the First Article. Licensee may only manufacture, display, market and make Commercial Sales of those Products for which Crye has approved in writing.

d.   Each First Article required pursuant to subsection (a) above shall be provided to Crye free of charge and shall be delivered to Crye, shipment prepaid, at the address first set forth in the Agreement, or at such other address as may be provided by Crye to Licensee from time to time.

**II.      First Article Quality Control Requirements**

a.   **Shade Matching.** Licensee shall utilize Crye's "Graphic Shade Standard" (which will be delivered to Licensee as part of the First Article MCAP) to ensure accurate color reproduction. The color and general appearance of the First Article must be a good match to Crye's Graphic Shade Standard when viewed using the AATCC Evaluation Procedure 9-2007, with sources simulating artificial daylight D75 illuminant with a color temperature of 7500 (+ 200) °K illumination of 100 (+ 20) foot candles. The color and appearance of the First Article shall additionally be a good match to the Graphic Shade Standard when viewed under incandescent lamplight at 2856 (+ 200)°K (Note: There are no Pantone color references for MultiCam, and as such, all shade inspection shall be performed visually using the supplied Graphic Shade Standard). Lastly, final shade evaluation of First Article and the supplied Graphic Shade Standard should be viewed outdoors in natural daylight conditions.

b.   **Pattern Execution.** The pattern on the printed finished material(s) shall reproduce the standard sample in respect to design, colors and registration of the respective areas. The various areas of the pattern shall be properly registered in relation to each other and shall present definite sharp demarcations with a minimum of feathering or spew. Each pattern area shall show solid coverage free from potential flaws from First Article production process.

8

Crye Version 1.1



c. **Scale.** Licensee shall not, at any time, adjust the scale of the pattern from its original form (as depicted in the First Article MCAP sent to Licensee) unless otherwise requested by Crye.

d. **Additional Requirements.** In addition to the quality control requirements set forth in Section II (a)-(c) above, Licensee shall additionally comply with (i) any and all quality control requirements set forth in the various MCAP's being delivered to Licensee, and (ii) additional quality control requirements which may be provided to Licensee in writing by Crye, from time to time, after the execution of this Agreement.

9

Crye Version 1.1



### Schedule D
### Commercial Sales - MultiCam Production Quality Control Requirements

**I.  General Quality Guidelines**

a.  Licensee shall routinely perform quality control testing of the Products in accordance with industry standards, to verify that the Products conform fully to Crye's specifications.

b.  Each Product sold pursuant to this Agreement shall be of the same quality as its respective First Article, and shall be manufactured using the same materials as were used in the First Articles. Licensee shall cause to be used the most appropriate manufacturing processes, techniques and quality control procedures to ensure that the Products remain consistent.

c.  In addition to the audit rights set forth in Section 4 of the Agreement, Crye shall be entitled, upon reasonable notice to the Licensee, to have a representative enter and inspect the facilities listed in Schedule B above. Licensee agrees to grant Crye's representative access to the same, and to permit Crye to review samples of the Products.

**II.  Production Quality Control Requirements**

a.  Upon approval of the First Article(s), Crye shall deliver to Licensee a comprehensive "Production MCAP", which contains additional technical information necessary to produce the Products for sale ("Production Articles").

b.  From time to time during the term of this Agreement, Licensee shall be required to submit production samples of each Product to Crye for approval. The required sampling for each Product shall initially be as set forth below (provided, however, the Crye reserves the right to adjust the required sampling for any given Product upon written notice to the Licensee):

**Products**

| PRODUCT DESCRIPTION | ITEM NUMBER | REQUIRED SAMPLING |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

a.  **Shade Matching.** Licensee shall utilize Crye's "Graphic Shade Standard" to ensure accurate color reproduction. The color and general appearance of the Production Articles must be a good match to Crye's Graphic Shade Standard when viewed using the AATCC Evaluation Procedure 9-2007, with sources simulating artificial daylight D75 illuminant with a color temperature of 7500 (+ 200) °K illumination of 100 (+ 20) foot candles. The color and appearance of the Production Articles shall additionally be a good match to the Graphic Shade Standard when viewed under incandescent lamplight at 2856 (+ 200)°K (Note: There are no Pantone color references for MultiCam, and as such, all shade inspection shall be performed visually using the supplied Graphic Shade Standard). Lastly, final shade evaluation of Production Articles and the supplied Graphic Shade Standard should be viewed outdoors in natural daylight conditions.

b.  **Pattern Execution.** The pattern on the printed finished material(s) shall reproduce the standard sample in respect to design, colors and registration of the respective areas. The various areas of the pattern shall be properly registered in relation to each other and shall present definite sharp demarcations with a minimum of feathering or spew. Each pattern area shall show solid coverage free from potential flaws from production process.

10

Crye Version 1.1



64 Flushing Avenue Unit 252
Building 275 Room 301
Brooklyn NY 11205

P 718 246 4634
F 718 246 4633
www.cryeprecision.com

c.  **Scale.** Licensee shall not, at any time, adjust the scale of the pattern from its original form (as depicted in the various Production MCAP's sent to Licensee) unless otherwise requested by Crye.

d.  **Logo.** Licensee agrees that all Products manufactured for Commercial Sale shall incorporate the MultiCam™ logo (or any other logo, symbol or trademark the Crye may provide to Licensee from time to time) in the manner directed by Crye.

11

Crye Version 1.1



## Schedule E
## Licensing Fees

I.      For Commercial Sales, the Licensing Fees for the Products shall initially be as follows:

| PRODUCT DESCRIPTION | ITEM NUMBER | COMMERICAL SALE LICENSING FEE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

II.     For Government Sales, the Licensing Fees for the Products shall initially be as follows:

| PRODUCT DESCRIPTION | ITEM NUMBER | GOVERNMENT SALE LICENSING FEE |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

Agreed to and acknowledged by:

_____          _____          _____
(Print Name and Title)                      (Signature)                             (Date)


_____          _____          _____
(Print Name and Title)                      (Signature)                             (Date)

12

Crye Version 1.1



### Schedule F
### Channels of Distribution and Territories

I.   **Government Sales:** The Channels of Distribution and Territories for <u>Government Sales</u> (as that term is found in <u>Section 1.2</u> of the Agreement) of the Products shall be limited to the following:

In fulfillment of contracts issued by the United States Department of Defense.

II.  **Commercial Sales:** The Channels of Distribution and Territories for <u>Commercial Sales</u> (as that term is found in <u>Section 1.3</u> of the Agreement) of the Products shall be limited to the following:

Sales to customers within the fifty (50) United States.

13

Crye Version 1.1

# EXHIBIT D



# Bennettsville Printing

## 410 Highway 385
## Bennettsville, SC 29512
## 843-479-4021  FAX: 843-454-0402

October 29, 2014

Victor Winogradow
Bennettsville Printing
5 Shaw's Cover Suite 220
New London, Ct 06320

Gregg Thompson, Director
Crye Precision
63 Flushing Ave Unit 252
Building 275 Room 301
Brooklyn, NY 11202

Dear Greg:

As you know, Bennettsville Printing entered into a Non Exclusive License Agreement with Crye Precision LLC on April 10, 2012 which agreement terminated on or about April 10, 2014. During the term of that agreement, no production of goods subject to the MultiCam intellectual property protection occurred and no funds are due to Crye Precision.

Crye Precision LLC submitted an Intellectual Property License Agreement on or about May 30, 2014 which, we understand is in the nature of a renewal of the 2012 Agreement, but contains substantially different terms and is between different parties when compared to the 2012 Non Exclusive License Agreement. The 2014 renewal was not executed by Bennettsville Printing as the document was incomplete. It was and is the understanding by Bennettsville Printing that the new 2014 Agreement is not active, activated or in force until fully completed and executed by a duly authorized representative of Bennettsville Printing.

Your most recent E-Mail transmission of October 24, 2014 confirms that the Bennettsville Printing interpretation is correct as it forwards an almost fully completed document and requests a validating signature and additional information from Bennettsville Printing.

At this time Bennettsville Printing does not consider itself bound by any agreement with Crye Precision and of course will not print goods subject to the Multicam intellectual property without entering into a license agreement with Crye Precision or its designee.

Bennettsville Printing is not executing the 2014 Agreement at this time. Should you wish to discuss this matter further, I am most willing to do so.

Very truly yours,

Victor Winogradow
CEO

# EXHIBIT E

 CRYE PRECISION..

63 Flushing Ave Unit 252    P 718.246.3838
Building 275 Room 301       F 718.246.3833
Brooklyn NY 11205           www.cryeprecision.com

December 16, 2014

**VIA CERTIFIED MAIL, R.R.R AND**
**ELECTRONIC MAIL TO VWDSP@YAHOO.COM**
Bennettsville Printing
Attn: Victor Winogradow, CEO
410 Highway 385
Bennettsville, SC 29512

      Re:    Crye Precision LLC with Bennettsville Printing
               Intellectual Property Licensing Agreements dated April 10, 2012 and May 30, 2014

Dear Mr. Winogradow:

By way of introduction, I am the General Legal Counsel for Lineweight LLC ("Lineweight") and Crye Precision LLC ("Crye"). We are in receipt of your letter dated October 29, 2014, which was addressed to Mr. Gregg Thompson, an owner of Crye and Lineweight. Crye strongly disagrees with the assertions in the letter, namely, that Bennettsville is not "bound by any agreement with Crye Precision".

Crye has in its possession an original signed copy of the 2014 Agreement, which, notwithstanding your claims to the contrary, contains terms clearly demonstrating that the Agreement is in full force and effect. Crye additionally rejects your interpretation of Mr. Thompson's email of October 24, 2014, and is confident that any Court reviewing this email (or any of several other email transmissions which transpired after the execution of the 2014 Agreement) will agree that Bennettsville's actions clearly demonstrate that it believed itself to be bound by the 2014 Agreement.

In addition, even if, arguendo, the May 30, 2014 licensing agreement is ultimately determined to not be binding, Bennettsville remains bound by the terms of the April 10, 2012 licensing agreement which was entered into between Crye Precision LLC and Lineweight LLC (the "2012 Agreement"). While your letter accurately states that the April 10, 2012 agreement expired on April 10, 2014, Bennettsville nonetheless remains bound by certain obligations (including those found in Section 3(h) of that Agreement) which survive the expiration of the agreement (See Section 9(f)). Your statement that "no production of goods subject to the MultiCam intellectual property protection occurred" during the term of the 2012 Agreement is of no legal import.

Lastly, your statement that the 2014 Agreement "is between different parties when compared to the 2012 Non Exclusive License Agreement" is also of no legal import, except that it will likely serve to strengthen Lineweight and Crye's positions by ensuring that each company continues to enjoy the benefits of the restrictive covenants present in each of the 2012 and 2014 Agreements.

 **CRYE PRECISION.**

63 Flushing Ave Unit 252 P 718.246.3838
Building 275 Room 301 F 718.246 3833
Brooklyn NY 11205 www.cryeprecision.com

Notwithstanding the disconcerting tone of your letter, Crye remains willing to engage in further discussion about this. **<u>As such, we will look forward to your written response within five (5) calendar days from the date of this letter.</u>**

In the meantime, please guide yourselves accordingly.

This letter does not represent a full and complete statement of Crye Precision LLC and Lineweight LLC's rights, and nothing in this letter shall be deemed a waiver of any rights or remedies, all of which are expressly reserved.

Regards,

Jonathan E. Antone
General Counsel
Crye Precision LLC
Lineweight LLC

Cc: Gregg Thompson
   Caleb Crye