UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
CRYE PRECISION LLC, and
LINEWEIGHT LLC,

**MEMORANDUM & ORDER**
15-cv-00221 (FB) (RER)

Plaintiffs,

-against-

BENNETTSVILLE PRINTING,

Defendant.
--------------------------------------------------x

*Appearances:*
*For the Plaintiffs:*
ROBERT ALLEN HOROWITZ
Greenberg Traurig LLP
MetLife Building
200 Park Avenue, 15th Floor
New York, New York 10166

LAUREN BETH GRASSOTTI
Meyer Suozzi English & Klein PC
990 Stewart Avenue, Suite 300
Garden City, New York 11530

*For the Defendant:*
CHRISTIAN DOMINIC CARBONE
JONATHAN FRANK HOLLIS
Loeb & Loeb LLP
345 Park Avenue
New York, New York 10154

**BLOCK, Senior District Judge:**

Crye Precision LLC and its sister company Lineweight LLC (collectively,
"Crye") sued Bennettsville Printing ("Bennettsville") for breach of contract; trade dress
infringement under the Lanham Act, 15 U.S.C. § 1125(a); and unfair competition based
on Bennettsville's refusal to pay a royalty allegedly owed to Crye for printing a
particular camouflage design. Crye sought declaratory and injunctive relief and

damages.  Bennettsville moves for summary judgment under Federal Rule of Civil Procedure 56(a), and Crye requests to withdraw its claims for trade dress infringement and unfair competition.  The Court construes Crye's request as a motion to withdraw without prejudice under Federal Rule of Civil Procedure 41(a)(2).  For the reasons set forth below, Crye's motion to withdraw is denied and Bennettsville's motion for summary judgment is granted.

## I. Background

The parties submitted evidence of the following facts, which are not in dispute.

### A. MULTICAM and Scorpion W2

Crye develops camouflage patterns for military and commercial applications.  In the early to mid 2000s, it designed one such pattern called MultiCam ("MULTICAM").  Pl.'s Thompson Decl. ¶ 5 (Sept. 2, 2017).  Crye owns multiple patents directed to MULTICAM and also claims copyright and design trademark protection in the pattern.  *Id.* ¶ 9; *Id.* Ex. K at 6.

For several years, the U.S. Army's official camouflage pattern for all combat field uniforms had been "a gray and green pixelated design" called "UCP."  Def.'s Winogradow Decl. ¶ 14.  That design was poorly suited to Afghanistan, and so the Army sought alternatives.  *Id.* ¶ 15.  In 2006, it adopted MULTICAM as its official camouflage pattern for Special Forces.  Pl.'s Thompson Decl. ¶ 10. And in 2010,

MULTICAM became the Army's standard issue camouflage for all soldiers deployed in Afghanistan. Pl.'s Thompson Decl. ¶¶ 11-12.

Despite expectations that MULTICAM would soon replace UCP as the Army's official camouflage pattern for all combat field uniforms, the Army announced in May 2014 that it would adopt another design of its own creation called "Scorpion W2." Def.'s Winogradow Decl. ¶¶ 15-16; Def.'s Hollis Decl. Exs. 7 & 8.[1] According to Crye's Director Gregg Thompson, "[t]he overall appearance of Scorpion W2 is virtually indistinguishable from MULTICAM." Pl.'s Thompson Decl. ¶ 45.

## B. Crye's Licensing Program

The Army's use of MULTICAM generated significant licensing business for Crye. It had initially granted an exclusive license to non-party Duro Textiles, LLC ("Duro") in 2008 to print MULTICAM for a two-year term. Pl.'s Thompson Decl. ¶ 25. However, when the Army selected MULTICAM for Afghanistan operations, it requested that Crye license additional printers. *Id.* ¶ 27. To that end, Crye executed standard non-exclusive license agreements with a network of printers, including Duro. *Id.* ¶¶ 28-34. In April 2010, Defendant Bennettsville executed one such agreement with Crye for a two-year term. Pl.'s Thompson Decl. Ex. C at 1, 5.

---

[1] The parties dispute whether the Army's announcement occurred in April or May. *Compare* Def.'s Winogradow Decl. ¶¶ 15-16 (stating April), *with* Pl.'s Thompson Decl. ¶ 44 (stating May). However, the precise date is not material.

## 1. 2012 Agreement

When the first license expired in 2012, Crye entered into a new agreement ("2012 Agreement") with Bennettsville for another two-year term. *See* Def.'s Winogradow Decl. Ex. 1 (2012 Agreement) at 1, 5. The 2012 Agreement gave Bennettsville a non-exclusive license to print MULTICAM on specific products for the purpose of fulfilling U.S. Government contracts. *Id.* at 1, 11. Section 3(h) contained a non-compete clause with the following language:

> LICENSEE acknowledges and agrees that it will not disassemble, decompile, or reverse engineer MULTICAM or any other intellectual property right of CRYE, including patent, trademark and copyrights, licensed from CRYE or, during or after the term or expiration of this Agreement, make any products that are similar to MULTICAM through color palette, pattern or arrangement or placement of any elements incorporated in MULTICAM. Furthermore, Licensee agrees that it shall not make any additions to, new renderings of, or modifications, embellishments, derivative works or other changes of or to MULTICAM or any other intellectual property rights of CRYE without CRYE's prior written consent and Licensee agrees that all such additions, renderings, modifications embellishments, derivative works or otherwise shall be and remain the sole property of CRYE.

*Id.* § 3(h). The 2012 Agreement further provided that the non-compete clause would survive expiration of the Agreement, *id.* § 9(f), and was governed by New York law, *id.* § 14(d).

## 2. 2014 Agreement

On April 16, 2014, soon after the 2012 Agreement expired, Crye sent Bennettsville a new license agreement (the "2014 Agreement"). Def.'s Winogradow Decl. ¶ 10. The 2014 Agreement gave Bennettsville the non-exclusive right to print MULTICAM for Government and commercial sales of specified Products. *Id.* Ex. 2 § 1.1. Under §§ 1.4 and 1.8, Bennettsville was prohibited from printing or selling MULTICAM products and "variations or modifications" of licensed Products without disclosing them to Crye and paying a fee. *Id.* §§ 1.4, 1.8.

For commercial sales, Bennettsville's right to print MULTICAM was "conditioned upon" its compliance with an approval process. *Id.* § 2.1. That process required Bennettsville to submit samples of new products to Crye for approval. *Id.* § 2.1.2. Crye was to convey its approval by sending to Bennettsville a completed licensing fee form listing the new products and the associated fees, and Bennettsville was to sign and return it.[2] *Id.* §§ 2.1.2-3. A different procedure applied to the sale of Government products, *id.* § 2.2, which were to be sampled by a Government representative, tested in a government-approved lab, and certified by means of a designated form, *id.* § 1.2.

Section 7 of the 2014 Agreement contained the following updated non-compete clause:

---

[2] A blank copy of the licensing form was attached to the 2014 Agreement. *Id.* at 12 (Schedule E, Licensing Fees).

**Restriction on Similar Products.** Except for the products for which Crye shall be entitled to receive Licensing Fees, Licensee agrees that it shall not at any time during the term of this Agreement or at any time thereafter, make or provide, or assist or encourage others to make, products which are confusingly similar in design or appearance (i.e., color palette, arrangement or placement of elements) to, or which constitute derivative works of, any of the IP.

*Id.* § 7.

On April 17, 2014, after receiving the Agreement, Bennettsville Vice President Ronald H. Levine ("Levine") wrote to Thompson, "I'm signing the license now and sending it to you under separate cove[r] . . . ." Pl.'s Thompson Decl. Ex. G (Apr. 17, 2014 Email from Ronald H. Levine to Gregg Thompson). Levine also asked if Crye had "determined what the licensing fee will be," asked whether "the fee [will] be the same for both Government and Commercial business," and discussed sending product samples to Crye for approval. *Id.*; Pl.'s Thompson Decl. Ex. H.

On May 15, 2014, Levine emailed Thompson the following message: "I submitted the licensing agreement to you together with the NYCO samples (in the same fed ex envelope) If you don't have it I can fed ex another signed copy to you. We're very anxious to receive the license as we have pending orders for MultiCam." *Id.* Ex. I (May 15, 2014 Email from Levine to Thompson). Later, Levine emailed again, writing, "Haven't heard back from you on the commercial license for MultiCam ????" *Id.* Ex. J (May 28, 2014 Email from Levine to Thompson). Thompson responded with a "countersigned version" of the 2014 Agreement. *Id.* (June 2, 2014 Email from

Thompson to Levine).  The final version of the 2014 Agreement was dated May 30, 2014, and signed for Crye by Thompson and for Bennettsville with the handwritten words "Bennettsvill [sic] Printing Vice President."  *Id.* at 1, 5.

On October 24, 2014, Thompson sent Bennettsville CEO Victor Winogradow a completed— but unsigned— copy of the licensing fee form.  Pl.'s Thompson Decl. Ex. N.  Winogradow forwarded Thompson's email to Bennettsville Director of Military and Specialty Fabrics John Murphy ("Murphy") with the following message: "I just received this from Crye.  they want to activate the license????  I will have to refer all this stuff to my attorney for review."  Pl. Horowitz Decl. (Sept. 2, 2017) Ex. D at BVP0002244 (Oct. 24, 2014 Email from Winogradow to Murphy).  Murphy proposed to Winogradow that Bennettsville accept Government contracts to print Scorpion W2 and refuse to pay Crye's "supposed royalty."  *Id.* at BVP0002243 (Oct. 24, 2014 Email from Murphy to Winogradow).

Bennettsville never returned a signed copy of the fee schedule.  Instead, Winogradow wrote to Thompson that the 2014 Agreement was incomplete and not executed by Bennettsville, that Bennettsville did not consider itself bound by any agreement with Crye, and that Bennettsville would not execute the 2014 Agreement. Pl.'s Thompson Decl. Ex. O (Oct. 29, 2014 Letter from Winogradow to Thompson).

Other printers in Crye's network each pay royalties to Crye for the right to print and sell Scorpion W2 pursuant to their own versions of the 2014 Agreement.  Pl.'s

Thompson Decl. ¶ 65-66. Bennettsville, however, has not sought Crye's authorization to print Scorpion W2 or paid any royalties. *Id.* ¶¶ 65-69.

## C. The *Duro* Proceedings

Duro similarly refused to pay Crye for the right to print Scorpion W2. Pl.'s Thompson Decl. ¶ 71. On February 17, 2015, Crye sued Duro in the Southern District of New York, asserting claims for breach of contract, trade dress infringement, and unfair competition. *Crye Precision LLC v. Duro Textiles*, LLC, 2016 WL 1629343, at *3 (S.D.N.Y. Apr. 22, 2016) (hereinafter "*Duro I*"). The court granted Duro's motion for summary judgment. As to Crye's breach of contract claim, the court reasoned that the non-compete clause in § 3(h) of the 2012 Agreement between Crye and Duro was unenforceable on the ground that it was "impermissibly broad in scope and unduly burdensome." *Id.* at *4-5.

As to Crye's trade dress infringement claim, the court reasoned that Crye had failed to demonstrate a likelihood of confusion on the part of the Government, which was the only direct purchaser of Scorpion W2 fabric. *Id.* at *6-7. Moreover, there was no evidence that downstream purchasers— soldiers who bought Scorpion W2 products in the Army Clothing and Sales Stores— had any discretion regarding the selection of camouflage patterns or that they were confused by any similarity in design. *Id.* at *8. Finally, the court dismissed Crye's unfair competition claim for the same reasons it dismissed the trade dress infringement claim. *Id.*

On May 3, 2017, the Second Circuit affirmed the district court's decision. It agreed that the non-compete clause was "unreasonable in scope and therefore, unenforceable[]" and further held that summary judgment was properly granted as to the trade dress infringement and unfair competition claims because Crye had "show[n] neither confusion nor bad faith." *Crye Precision LLC v. Duro Textiles, LLC*, 689 Fed. App'x 104, 106-08 (2d Cir. 2017) (summary order) (hereinafter "*Duro II*"). The Second Circuit denied Crye's petition for rehearing or, in the alternative, rehearing en banc.

## D. Proceedings in this Court

Crye filed its original Complaint on January 15, 2015. On August 27, 2015, the Court dismissed Crye's state law claims for unjust enrichment and unfair competition as precluded by 28 U.S.C. § 1498(a). On June 17, 2016, Crye filed its Amended Complaint, which included claims for (1) declaratory relief; (2) breach of the 2014 Agreement; (3) breach of the 2012 Agreement; (4) trade dress infringement, unfair competition, and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a); and (5) common law unfair competition.

Bennettsville answered the Amended Complaint on July 1, 2016, and now moves for summary judgment, arguing that (1) Crye's claims are barred by collateral estoppel, (2) summary judgment should be granted based on the reasoning applied by the district court in *Duro I*, and (3) Crye's trade dress and unfair competition claims fail because

MULTICAM is a functional design. Crye's arguments in opposition to summary judgment are addressed in context below.

## II. Discussion

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, "[t]he non-moving party may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998).

As an initial matter, Crye seeks to withdraw its Fourth and Fifth Claims, for trade dress infringement and unfair competition under state and federal law, in light of the Second Circuit's decision in *Duro II*. *See* Pl.'s Letter to the Court (May 8, 2017). Bennettsville has not responded to Crye's letter request.

After a defendant has filed an answer, a plaintiff may not dismiss an action without prejudice absent either a stipulation from all parties or an order of the court. Fed. R. Civ. P. 41(a)(1)-(2); *D'Alto v. Dahon California, Inc.*, 100 F.3d 281, 283 (2d Cir. 1996). The Court therefore construes Crye's request as a motion to voluntarily

dismiss its Fourth and Fifth Claims under Federal Rule of Civil Procedure 41(a)(2).

Voluntary dismissal under Rule 41(a)(2) should be allowed if there is no prejudice to the defendant. *Id.* Relevant factors include "the plaintiff's diligence in bringing the motion; any undue vexatiousness on plaintiff's part; the extent to which the suit has progressed, including the defendant's effort and expense in preparation for trial; the duplicative expense of relitigation; and the adequacy of plaintiff's explanation for the need to dismiss." *Zagano v. Fordham Univ.*, 900 F.2d 12, 14 (2d Cir. 1990).

Crye was reasonably diligent in bringing the motion less than a week after the Second Circuit's decision in *Duro II*, and nothing in the record suggests undue vexatiousness on its part. However, this litigation has lasted more than two years and progressed through a motion to dismiss and significant discovery. Bennettsville would be forced to duplicate considerable expense if Crye were able to relitigate its claims. Crye's only explanation for seeking to withdraw is the Second Circuit's decision in *Duro II*, suggesting that its main concern is that its claims will fail. Given that three of the five *Zagano* factors weigh against voluntary dismissal, Crye's motion to voluntarily dismiss its Fourth and Fifth Claims without prejudice is denied.

## A. Collateral Estoppel

Bennettsville argues that Crye's claims are barred by the doctrine of collateral estoppel because it unsuccessfully litigated virtually identical claims against Duro in *Duro I* and *Duro II*. New York preclusion law applies to Crye's breach of contract

11

claims and common law unfair competition claims. *See Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 41 (2d Cir. 1986) ("[A] federal diversity court should apply New York preclusion law to reach the same result as would a New York court sitting a block away." (internal quotation marks and citations omitted)). "Under New York law, collateral estoppel bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Evans v. Ottimo*, 469 F.3d 278, 281 (2d Cir. 2006) (citing *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455-56 (N.Y. 1985)). The party asserting collateral estoppel bears the burden of demonstrating identity of issues, while the party opposing the doctrine's application bears the burden of showing the absence of a full and fair opportunity to litigate the issue. *Id.* at 281-82.

### 1. Breach of the 2012 Agreement

The reasonableness of § 3(h) of the 2012 Agreement was necessarily decided against Crye in *Duro I* and affirmed in *Duro II*. Section 3(h) of the 2012 Agreement between Crye and Bennettsville is identical to § 3(h) of the 2012 Agreement between Crye and Duro. Moreover, the unenforceability of § 3(h) is decisive of Crye's claim that Bennettsville breached that section of the 2012 Agreement.

Crye argues that it did not have a full and fair opportunity to litigate the enforceability of § 3(h) because the district court stayed discovery and denied Crye's

motion for further discovery under Rule 56(d), forcing Crye to oppose Duro's summary judgment motion on an incomplete record. *See* Pl.'s Mem. of Law in Opp'n at 20-21. However, Crye does not describe what additional evidence it sought or how that evidence might have affected the court's decision. In any event, the district court in *Duro I* held that § 3(h) was unenforceable based on its text; additional evidence would not have undermined that conclusion. Crye has therefore not carried its burden of demonstrating that it lacked a full and fair opportunity to litigate the issue. *Evans v. Ottimo*, 469 F.3d at 282. Collateral estoppel precludes Crye's claim for breach of the 2012 Agreement.

### 2. Breach of the 2014 Agreement

The same reasoning does not apply to Crye's claim for breach of the 2014 Agreement. In *Duro I*, it was undisputed that Duro rejected the 2014 Agreement. *See Duro I* at *2. The validity of the non-compete clause in that Agreement therefore was not decided.

Bennettsville argues that the validity of the non-compete clause in the 2014 Agreement was "otherwise placed in issue and actually determined" because Crye asserted its validity in opposition to Duro's motion for summary judgment. Def.'s Mem. of Law at 10-11 (citing *Evans*, 469 F.3d at 282).

The court's analysis in *Duro I* included only two sentences discussing the 2014

Agreement.[3]  Although the court stated that the 2014 Agreement's non-compete clause was "similar" to the one in the 2012 Agreement, it made no statement concerning the overall validity of the clause.  And the court in *Duro II* did not mention the 2014 Agreement when affirming *Duro I*.  *See generally Duro II*.  Bennettsville has therefore not met its burden of showing identity of issues as to the 2014 Agreement, and application of collateral estoppel to Crye's claim for breach of that Agreement is inappropriate.[4]

### 3. Trade Dress Infringement and Unfair Competition

Collateral estoppel precludes Crye's claims for trade dress infringement and unfair competition.  A determination in a prior action that there is no likelihood of confusion between two marks may have collateral estoppel effect in a subsequent trademark infringement suit between different parties.  *See 6 McCarthy on Trademarks and Unfair Competition* § 32:89 (4th ed. 2017); *Georgia-Pac. Consumer Prod. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100 (6th Cir. 2012) (barring plaintiff in subsequent suit from relitigating likelihood of confusion issue despite different

---

[3] Considering the hardship imposed on Duro by the non-compete clause in the 2012 Agreement, the court stated: "Crye also asserts that Duro created its own hardship by rejecting Crye's 2014 Non-Exclusive License Agreement. But, that proposed agreement also contained a non-compete clause similar to § 3(h) in the 2012 License Agreement." *Duro I* at *6.

[4] The *Restatement (Second) of Judgments* states that "[p]reclusion ordinarily is proper if the question is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action." *Restatement (Second) of Judgments* § 27 cmt. c (1982).  However, research does not reveal any instances of New York courts applying that rule to *similar*, but not *identical*, contract provisions.  The Court declines to do so here.

defendant); *Cf. Levy v. Kosher Overseers Ass'n of Am., Inc.*, 104 F.3d 38, 42 (2d Cir. 1997) (agreeing with *McCarthy* that previous decision by the Trademark Trial and Appeal Board on likelihood of confusion should have preclusive effect where the Board's decision "t[ook] into account, in a meaningful way, the context of the marketplace").

In *Duro I*, the district court considered the issue of confusion in precisely the same context as it appears now, and Crye does not argue otherwise. Crye's claims for trade dress infringement and unfair competition require the same showing of likelihood of confusion or actual confusion. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-35 (2d Cir. 1995) (applying same likelihood of confusion analysis to both Lanham Act and common law trade dress infringement and unfair competition claims). The issue is therefore decisive of Crye's trade dress infringement and unfair competition claims.

Crye argues that the court in *Duro I* misconstrued the record and ignored evidence relevant to the issue of confusion. *See* Pl.'s Mem. Law in Opp'n at 20, 26-32. Specifically, Crye states that the district court ignored evidence that, during a virtual town hall held in 2015, former Army Chief of Staff General Ray Odierno gave a description of upcoming uniform changes in which he referred to MULTICAM when he meant to refer to Scorpion W2. *Id.* at 27-28. But the Second Circuit rejected that argument in *Duro II* when it held that such evidence was unpersuasive because Crye

did not show that General Odierno "had any role in selecting or purchasing W2." *Duro II* at 108.[5]

To summarize, collateral estoppel bars Crye's claims for breach of the 2012 Agreement; trade dress infringement, unfair competition, and false designation of origin under the Lanham Act; and common law unfair competition. However, the Court declines to apply collateral estoppel to Crye's claims for a declaratory judgment and breach of contract based on the 2014 Agreement.

## B. 2014 Agreement

### 1. Declaratory Relief

Bennettsville argues that Crye's declaratory judgment claim is duplicative of its claim for breach of contract based on the 2014 Agreement. Def.'s Mem. of Law at 12 (citing *Goldmark, Inc. v. Catlin Syndicate Ltd.*, 2010 WL 5872337, at *7 (E.D.N.Y. Nov. 22, 2010) (Report and Recommendation)). The Court agrees.

The Court determines whether to consider a declaratory judgment action based on five factors: "(i) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; (ii) whether a judgment would finalize the

---

[5] Although federal preclusion principles apply to Crye's Lanham Act Claim, *see Boguslavsky v. Kaplan*, 159 F.3d 715, 720 n.4 (2d Cir. 1998), the outcome is the same under both federal and state law of collateral estoppel. The only additional requirement imposed by federal preclusion law is that the resolution of the issue in the prior action was "necessary to support a valid and final judgment on the merits." *Id.* There is no question here that the *Duro I* court's conclusion on the issue of likelihood of confusion met that requirement.

controversy and offer relief from uncertainty; (iii) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (iv) whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and (v) whether there is a better or more effective remedy." *New York Times Co. v. Gonzales*, 459 F.3d 160, 167 (2d Cir. 2006) (internal quotation marks omitted) (citing *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359-60 (2d Cir. 2003)).

The *Gonzales* factors weigh against Crye's claim. Declaratory relief would not serve any useful purpose beyond the Court's consideration of the breach of contract claim because the Court must determine the validity of the 2014 Agreement as a preliminary matter in assessing that claim. Given Crye's other claims, declaratory relief would not "finalize the controversy." *Gonzales*, 459 F.3d at 167. And although there are no concerns regarding "procedural fencing" or friction between sovereign legal systems, "declaratory relief would serve no useful purpose as the legal issues will be resolved by litigation of the breach of contract claim." *Intellectual Capital Partner v. Institutional Credit Partners LLC*, 2009 WL 1974392, at *6 (S.D.N.Y. July 8, 2009). Crye's declaratory judgment claim is therefore dismissed.

## 2. Breach of Contract

As an initial matter, the Court considers whether the 2014 Agreement was properly executed by the parties. Bennettsville argues that the Agreement is invalid

because it was not signed by Bennettsville and is missing an essential term regarding price. Def.'s Mem. of Law at 11-12. New York's statute of frauds provides that an agreement "not to be performed within one year" is void "unless it . . . be in writing, and subscribed by the party to be charged therewith, or by his lawful agent." N.Y. Gen. Oblig. Law § 5-701(a)(1). However, "any symbol executed or adopted by a party with the present intention to authenticate a writing shall constitute a signing." *Id.* § 5-701(4). The symbol or mark must simply be "inserted or adopted with an intent, actual or apparent, to authenticate the writing." *Mesibov, Glinert & Levy, Inc. v. Cohen Bros. Mfg. Co.*, 245 N.Y. 305, 310 (1927). Even the name of a company appearing at the top of printed letterhead may be adequate with sufficient intent. *Id.* (collecting cases); *cf. Parma Tile Mosaic & Marble Co. v. Estate of Short*, 87 N.Y.2d 524, 528 (1996) (holding that faxed company name did not demonstrate intent to authenticate only because it was automatically affixed to the document).

Here, uncontroverted evidence shows that the 2014 Agreement was signed on the signature line with the written words "Bennettsvill [sic] Printing Vice President." Def.'s Winogradow Decl. Ex. 2 at 5. Furthermore, Levine stated that he was "signing the license now and sending it to [Thompson]," and, later, that he had "submitted the licensing agreement" and would "fed ex another signed copy" if Thompson had not received it. *Id.* Ex. I. These statements show that Levine intended to authenticate the 2014 Agreement in his capacity as Vice President. In opposition, Bennettsville offers

only conclusory assertions that it "never entered into the Proposed 2014 License or otherwise agreed to be bound by it." Def.'s Winogradow Decl. ¶ 11; *see also* Pl.'s Thompson Decl. Ex. O. These statements, unsupported by evidence, are insufficient. *See Scotto*, 143 F.3d at 114.

The Court also rejects Bennettsville's argument that the 2014 Agreement was void because it omitted the price term. The terms of the Agreement explicitly contemplated that certain conditions, such as Bennettsville's submission of product samples and Crye's approval or those samples, would be met before a price term was established by further agreement of the parties. *See* Def.'s Winogradow Decl. § 2.1. Under New York law, a preliminary agreement that leaves essential matters for further negotiation is a valid contract and imposes a duty on the parties to negotiate those unsettled matters in good faith. *See IDT Corp. v. Tyco Grp.*, 13 N.Y.3d 209, 214 (2009); *see also Brown v. Cara*, 420 F.3d 148, 158 (2d Cir. 2005) (recognizing that preliminary agreements leaving "critical" matters to further negotiation are valid under New York law). The 2014 Agreement was therefore a valid and binding agreement between the parties.

However, the non-compete clause suffers from the same problems that plagued § 3(h) of the 2012 Agreement. Courts analyze restrictive covenants in commercial contracts, such as license agreements, "under a simple rule of reason, balancing the competing public policies in favor of robust competition and freedom to contract."

*DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197 (E.D.N.Y. 1999).

Three factors guide the Court: (1) whether the covenant protects a legitimate business interest, (2) the reasonableness of the covenant with respect to geographic scope and temporal duration, and (3) the degree of hardship imposed upon the party against whom the covenant is enforced. *Id.* at 197. The Court's application of these factors depends on "the totality of the circumstances." *Greenwich Mills Co. v. Barrie House Coffee Co.*, 91 A.D.2d 398, 401 (2d Dep't 1983).

Here, § 7 of the 2014 Agreement appears to protect Crye's business interest in its intellectual property. Crye further asserts that it aims to prevent unfair competition. Even assuming that these are legitimate business interests, § 7 is unreasonably expansive. Like § 3(h) of the 2012 Agreement, § 7 is unlimited in geographic scope and duration. Crye states that any limitation is infeasible because the risk of unfair competition remains"as long as Crye continues to market and use the MULTICAM brand." Pl.'s Mem. of Law in Opp'n at 17 n.7. However, Crye does not explain why § 7 should not expire when Crye's marketing and use of MULTICAM ends. Section 7 extends beyond protection of Crye's asserted interests and is unnecessarily broad in scope and duration.

This unreasonable breadth is compounded by the hardship imposed on Bennettsville. The provision prohibits Bennettsville from making or providing products that are "confusingly similar in design or appearance (i.e., color palette,

arrangement or placement of elements)."  This language provides no objective means to determine a breach, and, like the 2012 Agreement, could be read to prevent Bennettsville from printing any camouflage pattern at all.  Contrary to Crye's argument, the addition of the word "confusingly" is insufficient to save § 7 from the same fate as § 3(h) of the 2012 Agreement; the clause could still be read to prevent Bennettsville printing any camouflage pattern.  Section 7 is therefore unreasonably burdensome and unenforceable.

In its briefs and at oral argument, Crye argued that a non-compete clause like § 7 is enforceable despite its lack of geographic and durational restrictions, citing multiple out-of-circuit cases.  *See* Pl.'s Opp'n Mem. of Law at 14-17.  However, those cases do not apply New York law and are otherwise inapposite.

In *Universal Gym Equip., Inc. v. ERWA Exercise Equip. Ltd.*, 827 F.2d 1542, 1551 (Fed. Cir. 1987), the Federal Circuit held that a non-compete clause was valid despite its lack of "temporal and geographic limitations" because it did not prohibit defendant ERWA from competing altogether— rather, it imposed one limitation: that ERWA "not use Universal's features, designs, technical knowledge, and know-how." *Id. Universal Gym* is not on point: the court there applied California law, not New York law, and the clause at issue was narrower and, therefore, less burdensome than the language at issue here.  ERWA was prohibited from using Universal Gym's actual "features, designs, technical knowledge, and know-how," while § 7 extends beyond the

actual features and designs of MULTICAM to cover products that are "confusingly similar in design or appearance" to MULTICAM. Under New York law, this breadth combined with the other features discussed above make § 7 unenforceable.

In *IDX Systems Corporation v. Epic Systems Corp.*, 285 F.3d 581 (7th Cir. 2002), the court applied the law of Wisconsin to uphold a clause prohibiting a software user from disclosing or reverse-engineering the plaintiff's software. *IDX Sys.*, 285 F.3d at 584-85. *IDX* thus involved a non-disclosure clause, not a non-compete clause. The difference was significant. The court acknowledged that Wisconsin law required a *non-compete* clause to be "reasonable, a limitation that in Wisconsin entails some restrictions on time and scope," *id.* at 585, but held that such restrictions did not apply to *non-disclosure* agreements relating to intellectual property, *id.* at 586. *IDX* therefore does not even support the proposition that a non-compete clause unlimited in time and space is enforceable under the law of Wisconsin, much less New York.

The court in *Layne Christensen Co. v. Bro-Tech Corp.*, 836 F. Supp. 2d 1203, 1224 (D. Kan. 2011), on which Crye also relies, held that a non-compete clause prohibiting defendant's use of certain intellectual property was valid under a Kansas antitrust statute and Delaware contract law. *Layne*, 836 F. Supp. 2d at 1223-26, 1231-34. Kansas antitrust law is not relevant to this case. And the court's validation of the clause under Delaware law is not persuasive. First, the court relied heavily on *IDX*, which is inapplicable for the reasons discussed above. Second, the court did not

explicitly consider the hardship imposed on the defendant, who certainly faced less hardship than Bennettsville faces here. The defendant in *Layne* was free to make or sell products that were similar to the plaintiff's as long as they were "not based on or resulting from the [plaintiff's] own intellectual property." *Id.* at 1234. Section 7 of the 2014 Agreement, by contrast, prohibits Bennettsville from making or selling similar products whether or not they are based on or resulting from Crye's intellectual property. *Layne Christensen* is therefore inapposite and unpersuasive.

Crye also relies on *Luv N' Care, Ltd. v. Groupo Rimar*, 844 F.3d 442, 448 (5th Cir. 2016), but the court there applied Louisiana law and did not consider any of the factors relevant to the analysis of a restrictive covenant under New York law. Thus, none of the cases Crye cites undermine the Court's conclusion that § 7 is unenforceable under New York law.

Crye attempts to distinguish this case from *Duro I* on the basis that the court there addressed enforceability of the non-compete clause *after* expiration of the Agreement, while this case involves enforceability of a non-compete clause *during* the term of the Agreement. The distinction is irrelevant. The court in *Duro I* did not suggest that its analysis depended on whether the Agreement had expired, and Crye cites no binding authority for the proposition that the distinction matters under New York law. Whether the clause survives expiration of the agreement goes to the durational scope of the clause. *See DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F.

Supp. 2d 192, 197 (E.D.N.Y. 1999). But the Court must consider the totality of the circumstances, and duration is only one factor affecting its analysis. Other factors, such as the clause's purpose and geographic scope and the hardship imposed on Bennettsville, have nothing to do with whether the Agreement has expired at the time Crye seeks to enforce it.

In an apparent attempt to raise an equitable estoppel argument, Crye argues that Bennettsville created its own hardship by entering into the 2014 Agreement after learning that the Army was planning to replace MULTICAM with Scorpion W2. It argues further that Bennettsville had no good faith intention of fulfilling its contractual duties. Pl.'s Mem. of Law in Opp'n at 17-18. However, § 7 creates undue hardship not only because it prevents Bennettsville from printing Scorpion W2, but because, as discussed above, it could be read to prevent Bennettsville from printing any camouflage pattern. Moreover, as the court recognized in *Duro I*, the equitable remedy of estoppel cannot be used to support contract provisions that contravene public policy. *Duro I* at *6 (citing *Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 171-74 (2d Cir. 2012) and *Kaiser-Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 844 (2d Cir. 1952)).

Crye's breach of contract claim also included allegations that Bennettsville breached §§ 1.4 and 1.8 of the 2014 Agreement. Crye states, in its recitation of the procedural history in this case, that Bennettsville's summary judgment motion does not address these claims, *see* Pl.'s Opp'n Mem. at 1, 3. However, Bennettsville moves for

summary judgment as to the entire Amended Complaint, and Crye has set forth no "specific facts" demonstrating that Bennettsville printed MULTICAM on unauthorized products in violation of § 1.8. *See Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (stating that, in opposition to summary judgment, the non-moving party may not rest on the pleadings but must "set forth 'specific facts' demonstrating that there is 'a genuine issue for trial'"). Moreover, § 1.4's prohibition on "variations or modifications" of licensed products is unenforceable for the same reasons as § 7.

Summary judgment dismissing Crye's claim for breach of the 2014 Agreement is granted.

### III

For the foregoing reasons, Crye's motion to dismiss its Fourth and Fifth Claims is DENIED, Bennettsville's motion for summary judgment is GRANTED in its entirety, and the case is dismissed.

**SO ORDERED**

/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
September 27, 2017

25